Filed 1/9/12

# IN THE SUPREME COURT OF CALIFORNIA

| | | |
|---|---|---|
| THE PEOPLE, | ) | |
| | ) | |
| Plaintiff and Respondent, | ) | |
| | ) | S120750 |
| v. | ) | |
| | ) | |
| KEVIN DARNELL PEARSON, | ) | |
| | ) | Los Angeles County |
| Defendant and Appellant. | ) | Super. Ct. No. NA039436 |
| _____ | ) | |

Defendant Kevin Darnell Pearson was convicted and sentenced to death for the 1998 first degree murder of Penny Sigler, also known as Penny Keptra.  The jury found the murder was committed during the course of robbery, kidnapping, rape, and sexual penetration by foreign object, and that it involved the infliction of torture.  (Pen. Code, §§ 187, 189, 190.2, subd. (a)(17), (18).)[1]  In addition, defendant was convicted and sentenced to state prison for robbery, forcible rape, sexual penetration by foreign object, forcible rape and sexual penetration by foreign object while acting in concert, kidnapping for purposes of rape, and torture.  (§§ 206, 209, subd. (b)(1), 211, 261, subd. (a)(2), 264.1, 289, subd. (a)(1).)  On this automatic appeal (§ 1239, subd. (b)), we affirm the convictions of first degree murder and the other charged felonies, but reverse the judgment as to

---

[1]     All further statutory references are to the Penal Code.

1

the penalty of death due to the trial court's improper excusal of a prospective juror because of her views on capital punishment.

**FACTUAL BACKGROUND**

The evidence showed defendant and two other men, Jamelle Armstrong and Warren Hardy, killed the victim, a stranger to them, during a brutal robbery and sexual assault. The crimes took place late on the night of December 29, 1998, by a freeway embankment in Long Beach.

**Guilt Phase Evidence**

Between 11:00 p.m. and midnight on December 29, 1998, the victim, Penny Sigler, left her Long Beach home to go to the store. She had $6 worth of food stamps given to her by her roommate. Her nude body was found the next day on the freeway embankment of northbound Interstate 405, near the intersection of Wardlow Road and Long Beach Boulevard. The body was 10 to 15 feet from the bottom of the embankment, separated from the surface streets by a drainage ditch and, above the ditch, a nylon mesh fence supported by wooden stakes. One of the stakes was broken, a tennis shoe lay on the embankment, and there was blood on the fence and in the drainage area.

The victim's injuries were extensive. The medical examiner counted 114 injuries, including around 25 fractures, all of which appeared to have been inflicted before death. Blunt force trauma to the head and neck was a component of her death, but the medical examiner also found signs of asphyxiation. Sigler had sustained multiple blunt force injuries to her head, face and neck, including abrasions and bruising on her neck, bruising around both eyes, an exposed fractured left cheekbone, a laceration of the forehead exposing the skull bone, a wounded left cheek, a partially torn-off right ear, internal bruising and bleeding in the muscles of the neck, and broken neck bones. She also had blunt force injuries

2

on her back, chest, abdomen, arm and thigh. Some of the wounds could have been inflicted with a piece of wooden stake.

Sigler also suffered bruising, abrasions and lacerations in and around her genitalia, perineum and anus. A small splinter of wood was found in her vagina. Her genital injuries could have been caused by penetration with a wooden stake but not by penetration with a human penis.

On the night of December 29, defendant was at his friend Monty Gmur's house in Long Beach. He left around 10:00 p.m. with Warren Hardy and Jamelle Armstrong. According to Gmur, the men were drunk and boisterous when they left his house, though they were walking without difficulty.

The next day, defendant told Gmur he and the men he was with had killed "a white woman" after they left Gmur's home. After seeing a news report about Sigler's murder, Gmur asked defendant for more information. Defendant told Gmur the men had gone to the Wardlow Metro station, where they momentarily became separated. On hearing a commotion across the way, defendant went to see what was happening, found Hardy "stomping" on a woman, and tried to get him to stop. The victim had said she did not have any money; when they found her food stamps, Hardy became angry and beat her with a stick. Defendant told Gmur he helped Hardy and Armstrong move the victim from the street, over a fence to the freeway embankment, but attributed all the violence committed to Hardy. A few days later, Gmur contacted the police and told them what defendant had told him.

Long Beach Police Detective Bryan McMahon interviewed defendant on January 6, 1999. After initially denying all involvement, defendant said that he, Hardy and Armstrong, together with a man named Chris, had left Gmur's house late on the night of December 29 after drinking together. Chris soon left the group, and the remaining three took a Metro train to the Wardlow station. As they walked toward Long Beach Boulevard, Hardy lagging behind, defendant heard a

3

woman screaming for help and turned to find Hardy punching her. The woman momentarily escaped Hardy, running to a nearby fence. The victim either climbed and fell over the fence or was lifted over it; Hardy then jumped the fence and dragged her into a drainage ditch area. Defendant and Armstrong followed to find Hardy sitting on the woman's chest, gesturing to his crotch and demanding she orally copulate him. When defendant told Hardy that was disgusting and he could get AIDS from the blood on the victim's face, Hardy got up, zipped his pants, and resumed beating the victim with a stick, as he had been doing (while also stomping on her) earlier. Hardy and Armstrong then repeatedly jabbed the stick into the victim's vagina.

When Hardy and Armstrong stopped, defendant suggested they move the woman's body. Wrapping shirts around her, the three carried her farther up the freeway embankment. They then collected her clothing in a bag and carried the bag and stick to a bus stop on Long Beach Boulevard, where Armstrong threw the stick into a field. The three then rode the bus to Los Angeles, leaving the clothing in a trash can at a transfer point. They went to Hardy's girlfriend's house, where they stayed until the next day, when defendant and Hardy returned to Long Beach for some clothing; there was blood on the clothes they had worn during the killing.

On January 7, 1999, police arrested Hardy and Armstrong and searched their residences. Later that day, after receiving information from Hardy and Armstrong, Detective McMahon reinterviewed defendant. Without telling defendant what Hardy and Armstrong had said, McMahon informed defendant it was not entirely consistent with what defendant had told him. "More [had] happened out there" than defendant had admitted, and defendant "needed to tell the truth and take responsibility" for his own actions. Defendant nodded affirmatively and gave a significantly more incriminating version of events.

4

As the three men were walking to Long Beach Boulevard from the Wardlow station, defendant said, they were shouting "Happy New Year" and "Merry Christmas." They heard a woman yell back, "Yeah, Merry Christmas. Happy New Year." The men crossed the street and talked with the woman. At some point Hardy asked the woman where her money was; she said she didn't have any, but defendant started looking through her jacket pockets. When she tried to get away, defendant and Armstrong wrestled her to the ground and started pulling her clothes off and going through them, looking for valuables. Once she was naked, Hardy said, "We have to finish the job," and he and Armstrong began stomping on the victim's head and upper body. Defendant and Armstrong then threw the victim over the fence onto the freeway embankment, the three men jumped the fence, and Armstrong dragged her farther off the road.

Defendant, according to his January 7 statement, then unzipped his pants and raped the victim for a minute or less, while she struggled and Armstrong held one of her legs. When he quit, Hardy approached and began beating the victim with a stick or stake on her head and neck. Hardy and Armstrong again stomped on her, and defendant also did so, kicking or stomping on her upper body five or six times. Finally, Hardy and Armstrong vaginally penetrated the victim with the stick. The remainder of defendant's January 7 statement accorded with his earlier account: the three moved the victim's body up the embankment, collected clothing from the scene, and took the bus to Los Angeles, discarding the stick and clothing as previously described. The next day, Hardy spent food stamps they had taken from the victim at a Mexican market near his girlfriend's apartment.

In letters defendant wrote and sent after he was arrested, he said he did not kill the victim but kicked her in the head several times, and the victim was raped but he did not remember by whom.

5

The serial numbers of two food stamps that originated at a check cashing agency in Long Beach and were exchanged at Lorena's Market in Los Angeles matched those on a food stamp booklet cover found at the crime scene. DNA matching Hardy's was found in saliva on the victim's body. DNA matching that of Sigler, the victim, was found on boots and pants defendant had left at Hardy's girlfriend's house, items of clothing similar to those Gmur had seen defendant wearing on the night of December 29. Shoe prints at the crime scene were similar to the sole pattern of the boots.

Defendant testified in his own defense. In December 1998, he was living on the second floor of his mother's house; Gmur lived next door. On December 29, defendant drank a six-pack of Olde English 800 malt liquor before going to Gmur's house around 4:00 p.m. At Gmur's house, defendant, with others, smoked marijuana and drank beer and a mixture of alcoholic beverages they called "gasoline." By 9:00 p.m., defendant was drunk and high. The group, which included Hardy and Armstrong, drank some more, then finally left Gmur's house.

As defendant, Hardy and Armstrong walked along Wardlow Road toward Long Beach Boulevard, where they planned to catch a bus to Los Angeles, defendant heard a cry of pain from across the street. He saw Hardy with a woman. Holding the woman's jacket lapel, Hardy asked if she had any money, and when she said no, he accused her of lying, started looking through her pockets, and took the jacket off her to search it. Armstrong held the victim to prevent her from leaving or resisting. Though defendant told his friends to leave the woman alone, they both began to hit her face and head with their fists. Eventually Hardy and Armstrong forced the victim to the ground and started kicking her. Defendant continued to tell them to leave her alone.

6

Hardy and Armstrong threw the victim over a fence, then climbed over, as did defendant. Bleeding and in pain, the victim asked for help in a voice "like a gurgle." Armstrong dragged her to the drainage ditch area, then kicked her in the head and neck while Hardy kicked her chest. Armstrong and Hardy stripped the victim of her clothes, then beat and kicked her further. When defendant again told them to stop and started toward the fence, Hardy gave him a threatening look, asked where he was going, and said, "We have to finish the job." Armstrong found a stick and started beating the victim with it while Hardy continued to kick her. Eventually Armstrong used the stick to penetrate the victim vaginally; Hardy then grabbed the stick from Armstrong and did the same, while Armstrong kicked the victim.

When Hardy and Armstrong stopped their assault, defendant could tell the victim was dead because she did not seem to be breathing and the "water-type sound coming out of her throat" had stopped. Hardy said they had to "clean up." Defendant and Armstrong wrapped shirts around the victim so as not to touch her, then carried her up the embankment. They gathered her clothing and put it into a bag Hardy had. The three men then went to the bus stop on Long Beach Boulevard, Armstrong threw the stick into a field, and they boarded a bus. Hardy got into an altercation with a man on the bus, and when the driver threatened to call the police, defendant promised to keep Hardy calm. They threw the bag of clothing into a trash can in Los Angeles.

Defendant testified he had given Detective McMahon untrue versions of the events because he was scared and the detective kept calling him a liar. He told a different story in the January 7 interview because he thought if he told the detectives what they wanted to hear he would be released sooner. A detective told him Armstrong had said defendant raped the victim, so he repeated that false story to the detectives. During the killing, defendant did nothing to stop Armstrong and

7

Hardy from attacking the victim because he was afraid if he did so, they would turn on him and attack him.

**Penalty Phase Evidence**

For the prosecution, Janisha Williams testified that defendant, along with Williams and about 25 of their friends, was a member of the Capone Thug Soldiers, a gang,[2] and that initiation into this group required fighting two of the members for a few minutes. Once, several members of Capone Thug Soldiers, including the witness and defendant, beat up a person "for the fun of it." On other occasions, Williams saw defendant hit people with sticks or knock riders off their bicycles, in one case injuring the rider.

Monty Gmur testified that while defendant, Hardy and Armstrong were at his house on December 29, 1998, with a young man named Chris, they asked if they could use his back room to initiate Chris into their gang. When Gmur refused, the four left, returning about 15 minutes later. Gmur then heard Hardy on the telephone tell someone named Capone that "Chris is cool. We're going to call him Playboy."

Teddy Keptra, Penny Sigler's son, testified to the impact of her murder on him. Fifteen years old at the time of her death, he subsequently dropped out of high school and had difficulty holding a job. He missed his mother and thought of her constantly.

For the defense, Colette Burnett, defendant's mother, testified defendant's first stepfather, with whom he had had a good relationship, died in 1986, when defendant was nine years old. Burnett had a breakdown in 1989; she was

---

[2] Williams first denied Capone Thug Soldiers was a gang but, reminded of her contrary statement to police, then agreed it was.

8

hospitalized and unable to care for her children for several months, during which time defendant stayed with relatives and in foster care. In late 1989, she began living with a man named Saleem, whom she married in 1991. Saleem physically abused Burnett, despite defendant's efforts to stop him. Burnett herself sometimes hit defendant with a belt, broomstick or mop handle.

Defendant's younger brother testified Capone Thug Soldiers was a rap group, not a street gang, and consisted of only five or six people, including himself and defendant. He also testified Saleem hit their mother on many occasions, and she had beaten her sons regularly.

A former neighbor testified defendant used to babysit for her grandchildren, who lived with her. On one occasion, she saw Saleem try to hit defendant and his brothers with a two-by-four.

Psychiatrist Jack Rothberg interviewed defendant, administered psychological testing, and reviewed investigatory and trial materials relating to the case, including police reports and transcripts of defendant's police interviews and trial testimony as well as statements to police by Hardy and Armstrong. Defendant had described his family history, including his abusive stepfather, and told Rothberg of a conflict with Armstrong and Hardy that occurred sometime before the killing of Sigler. Defendant had accused Armstrong of stealing; in response, Armstrong, Hardy and "one of their gang friends" threatened defendant with a gun and told him to shut up about it. From his examination of defendant and review of materials, Rothberg concluded that during the attack on Sigler defendant was frightened of Hardy and Armstrong, "was shocked as the events unfolded and was really paralyzed to do anything about it . . . as if he was on a fast moving train he just couldn't stop or get off of." On cross-examination, Rothberg said he was aware that Armstrong and Hardy had told the police defendant raped the victim; he nonetheless believed defendant's denial of having done so.

9

The parties stipulated defendant had no prior criminal convictions.

**DISCUSSION**

## I. Denial of Suppression Motion

Defendant unsuccessfully moved to suppress his confession to the police, arguing in part that he should have been readvised of his rights under *Miranda v. Arizona* (1966) 384 U.S. 436 at the time of his second interview with Long Beach Police Detective McMahon, which took place on January 7, 1999. On appeal, defendant repeats his claim that Detective McMahon's failure to repeat, on January 7, the *Miranda* advisements given defendant before his first interview on January 6 rendered statements made in the second interview inadmissible.

At a hearing on the motion to suppress, Detective McMahon testified he first interviewed defendant on the afternoon of January 6, 1999, starting around 1:00 p.m. and ending around 6:45 p.m. McMahon advised defendant of his *Miranda* rights by reading aloud from a written form placed on the table between them, which defendant then signed, indicating he understood his rights and wished to speak with the detective. McMahon first interviewed defendant about the Sigler murder without a tape recorder, then tape-recorded defendant's statement.

After giving his first statement, defendant remained in the interview room until 4:00 or 5:00 a.m. the next morning, when he was booked into the jail, except for a period of a couple of hours during which he accompanied officers to the crime scene and other locations. While defendant was in the interview room, Detective McMahon and others, who were preparing to arrest Armstrong and Hardy and search their residences, came in occasionally to consult defendant on facts relevant to those preparations. On January 7, defendant remained in the jail until about 3:30 p.m. when Detective McMahon, who had received additional

10

information from Armstrong and Hardy, had defendant brought back to the homicide interview room.

Before the January 7 interview, Detective McMahon asked defendant if he remembered his rights from the day before. Defendant said he did. As on the previous day, McMahon first interviewed defendant without taping, then, beginning at 5:19 p.m., tape-recorded a statement.

The trial court found defendant had understood and voluntarily waived his *Miranda* rights before each interview. Following *People v. Mickle* (1991) 54 Cal.3d 140, the court found the January 7 interview reasonably contemporaneous with the administration of *Miranda* advisements and defendant's waiver of his rights on January 6, especially in light of the "continuous" law enforcement contact with defendant between the two events.

"[R]eadvisement is unnecessary where the subsequent interrogation is 'reasonably contemporaneous' with the prior knowing and intelligent waiver. [Citations.] The courts examine the totality of the circumstances, including the amount of time that has passed since the waiver, any change in the identity of the interrogator or the location of the interview, any official reminder of the prior advisement, the suspect's sophistication or past experience with law enforcement, and any indicia that he subjectively understands and waives his rights." (*People v. Mickle*, *supra*, 54 Cal.3d at p. 170; accord, *People v. Smith* (2007) 40 Cal.4th 483, 504.)

Considering all the circumstances, we agree with the trial court that defendant's January 7 interview was reasonably contemporaneous with his advisement and waiver of *Miranda* rights on January 6. Approximately 27 hours passed between the advisements and waivers on January 6 and the interview on January 7, a period longer than the 18 hours of *People v. Smith*, *supra*, 40 Cal.4th at pages 499-500, 504, but shorter than the 36 hours of *People v. Mickle*, *supra*, 54

11

Cal.3d at page 171, both of which found the events reasonably contemporaneous. As the trial court noted, defendant not only remained in custody but was, for much of the time, in contact with the investigating officers; even after the first interview ended, defendant took officers to locations he had mentioned in his first statement and answered their questions about Hardy's and Armstrong's residences. Before agreeing to the second interview, moreover, defendant was asked if he remembered his *Miranda* rights, and he said he did. The hearing record contains nothing suggesting to the contrary, i.e., that defendant had forgotten or no longer understood his rights.

Defendant correctly observes that in *People v. Mickle*, *supra*, 54 Cal.3d at page 171, we noted, as a factor in the analysis, the defendant's familiarity with the criminal justice system, a factor not shown to exist here. Considering "the totality of the circumstances" (*id*. at p. 170), however, we do not agree the absence of this factor alone undermined the trial court's finding that defendant had participated in the second interview voluntarily and with knowledge of his rights. Considering defendant's continuing contact and cooperation with police investigators through much of the time between advisement and the second interview, the passage of time was not so great as to create an inference that defendant, contrary to his own statement at the time, no longer understood or remembered the rights he had earlier waived.

Admission of statements made in the second interview did not, therefore, violate defendant's rights under the Fifth, Sixth, Eighth or Fourteenth Amendments to the United States Constitution, or his corresponding rights under the California Constitution.

12

## II. Failure to Record Entirety of Interview

Defendant contends admission of statements he made to Detective McMahon in the interview of January 7, 1999, violated his due process rights under the Fifth and Fourteenth Amendments to the United States Constitution because McMahon did not tape-record the entire interview or the entirety of the January 6 interview.

"Defendant argues due process requires application of a blanket rule requiring that all interrogations, including the *Miranda* warnings and waivers, be tape-recorded to facilitate later determinations of voluntariness.  He cites *Stephan v. State* (Alaska 1985) 711 P.2d 1156 in support.  While we have no wish to discourage law enforcement officials from recording such interrogations, we have already found that such a blanket rule is not required to protect the due process rights of those being interrogated (*People v. Holt* (1997) 15 Cal.4th 619, 663-665 [63 Cal.Rptr.2d 782, 937 P.2d 213]), and defendant fails to raise any argument convincing us that *Holt* was incorrectly decided."  (*People v. Gurule* (2002) 28 Cal.4th 557, 602-603.)

As we explained in *People v. Holt*, *supra*, 15 Cal.4th at page 664, federal due process is violated only when the government in bad faith fails to preserve evidently exculpatory evidence.  (See *Arizona v. Youngblood* (1988) 488 U.S. 51, 56-58; *People v. Webb* (1993) 6 Cal.4th 494, 519.)  Defendant takes issue with Detective McMahon's suppression hearing testimony that he does not tape-record the beginning of a suspect's interview because "when you begin talking with somebody, you place a tape recorder right in front of their face, they have a tendency to clam up," asserting that many police departments have hidden recording systems.  Defendant's skepticism about McMahon's motives, however, falls well short of a showing the detective acted in bad faith.  No violation of defendant's due process rights is established.

13

**III. Sufficiency of Evidence for Personal Use Finding**

The guilt phase jury found true several allegations that defendant personally used a deadly weapon in the commission of the various crimes of which he was convicted. These findings were, pursuant to sections 667.61, 12022 and 12022.3, used to determine and enhance defendant's state prison sentence.

The jury was instructed, with regard to the personal use allegations, that the only weapon to be considered was the stake or stick with which the victim had been beaten and sexually penetrated. We agree with defendant that the evidence was insufficient to support the findings he personally used the stake or stick in the crimes he committed against Sigler. In his testimony and in statements to the police and others, defendant admitted helping wrestle the victim to the ground and move her over the fence onto the freeway embankment, raping her, kicking or stomping on her head or upper body, and moving her body after the attack. The victim's beating and penetration with the wooden stake, however, defendant attributed to Hardy and Armstrong, and no other statements or testimony from percipient witnesses was introduced at defendant's trial. Sigler's DNA was found on defendant's boots and pants, and shoe prints at the scene were similar to those of defendant's boots, but no physical evidence tied defendant specifically to the stake, which police did not recover.

Even viewing the trial evidence in the light most favorable to the prosecution and presuming every fact the jury could reasonably deduce from that evidence (*People v. Maury* (2003) 30 Cal.4th 342, 403; *People v. Ochoa* (1993) 6 Cal.4th 1199, 1206), we find nothing from which a rational trier of fact could have found beyond a reasonable doubt that defendant personally wielded the stake in the attack on Sigler. No witness testified defendant used the stake, no out-of-court statements to that effect were introduced, and no physical evidence indicated he had used it. The evidence leaves it entirely *possible* defendant used the stake in

14

attacking Sigler, but does not support a finding of such use beyond a reasonable doubt.

The Attorney General argues the jury could infer defendant's personal use of the stake from his other violent criminal acts committed in concert with Hardy and Armstrong. To do so, however, would go beyond deduction to speculation. That defendant kicked and raped the victim could lead a rational trier of fact to suppose he may also, like his companions, have beat her with the stake, but not to infer beyond a reasonable doubt that he did so.

### IV. Jury Instructions on Torture and Related Offenses

Defendant contends the jury instructions on torture and related offenses and allegations were prejudicially flawed in several respects.

#### A. *Instruction on Torture as a Predicate Felony for First Degree Felony Murder*

In its instructions on felony murder as a theory of first degree murder, the trial court included torture (along with robbery, kidnapping, rape, and sexual penetration by foreign object) as a possible predicate felony upon which a guilty verdict could be based. As the Attorney General concedes, this was error, as torture in violation of section 206 was not added to section 189's list of predicate felonies for first degree murder until 1999, after Sigler's murder. (Stats. 1999, ch. 694, § 1, p. 5054.)[3]

---

[3] Torture as a predicate for first degree felony murder is distinct from first degree murder as a killing "perpetrated by means of . . . torture" (§ 189), a theory on which the jury was also instructed. "The elements of first degree murder by torture are: '(1) acts causing death that involve a high degree of probability of the victim's death; and (2) a willful, deliberate, and premeditated intent to cause extreme pain or suffering for the purpose of revenge, extortion, persuasion, or another sadistic purpose. [Citations.]' (*People v. Cook* (2006) 39 Cal.4th 566, 602 [47 Cal.Rptr.3d 22, 139 P.3d 492].) The prosecution need not establish that

*(footnote continued on next page)*

15

We agree with the Attorney General that the error was harmless because the jury necessarily convicted defendant of first degree murder on other, proper felony-murder theories. The jury found true special circumstance allegations that defendant murdered Sigler while engaged in the commission of robbery, kidnapping, rape, and foreign object rape. Because a killing in commission of any of these offenses constitutes first degree murder under section 189, it follows the jury must unanimously have found defendant guilty of first degree murder on the valid theory the killing occurred during the commission of these felonies. (See *People v. Haley* (2004) 34 Cal.4th 283, 315-316; *People v. Marshall* (1997) 15 Cal.4th 1, 38.) The erroneous instruction thus did not affect the verdict and was, on any standard of prejudice, harmless.

### B. Instructions on Intent to Inflict Pain

Defendant contends the instructions erroneously allowed the jury to reach guilty verdicts on the offenses of torture and first degree murder on a theory of murder by torture, and a true finding on the torture-murder special circumstance, without finding defendant had personally intended to inflict extreme pain and suffering on the victim.

The trial court instructed on the crime of torture (§ 206) through CALJIC No. 9.90, telling the jury that crime required proof that "[a] person inflicted great bodily injury" on the victim and that "[t]he person inflicting the injury did so with specific intent to cause cruel or extreme pain and suffering for the purpose of

*(footnote continued from previous page)*

the defendant intended to kill the victim (*ibid.*), but must prove a causal relationship between the torturous acts and the death [citation]." (*People v. Jennings* (2010) 50 Cal.4th 616, 643.)

16

revenge, extortion, persuasion, or for any sadistic purpose."[4]  Defendant is correct this instruction, by itself, does not require a finding that an aider and abettor to the torture personally harbored the specific intent that the torturer cause extreme pain to the victim.  The court's instruction defining aiding and abetting (CALJIC No. 3.01), however, explained that defendant was liable on that theory only if he acted "[w]ith knowledge of the unlawful purpose of the perpetrator" and "[w]ith the intent or purpose of committing or encouraging or facilitating the commission of the crime."  And while the court did instruct on the natural and probable consequences extension of accomplice liability (see *People v. McCoy* (2001) 25 Cal.4th 1111, 1117), telling the jury defendant was guilty of certain charged offenses if they were the natural and probable consequences of a target offense in which defendant might be found complicit, torture was not among the charged offenses listed in this instruction.[5]  The combination of instructions on torture and aiding and abetting thus ensured defendant could not be found guilty of torture as an aider and abettor without proof he knew and shared the actual torturer's specific intent to inflict extreme pain and suffering on the victim.  (*McCoy*, at p. 1118.)

The instruction on first degree murder perpetrated by torture (CALJIC No. 8.24), similarly to the instruction on the offense of torture, required a finding that

---

[4]      The instruction closely reflects the language of section 206.

[5]      Defendant points out that in argument to the jury the prosecutor incorrectly included torture as one of the charged crimes to which the jury could apply the natural and probable consequences rule and that in her rebuttal argument the prosecutor suggested the intent to cause pain, required for torture, could have been held by "defendant or his accomplices."  Defendant did not object to these statements at trial, however, and does not contend on appeal that they constituted prosecutorial misconduct.

17

"[t]he perpetrator" of the murder acted with the "intent to inflict extreme and prolonged pain" on the victim (see fn. 3, *ante*). Again, however, the aiding and abetting instruction (CALJIC No. 3.01) supplemented this direction by explaining an aider and abettor must know of the direct perpetrator's unlawful purpose and must act with the intent of furthering the perpetrator's crime. Perhaps a juror could have read the inclusion of murder in the list of charged crimes subject to the natural and probable consequences rule as suggesting defendant could be guilty of murder by torture if he intentionally assisted Hardy or Armstrong in one of the listed target crimes, regardless of defendant's personal intent regarding the victim's torture, though such a convoluted interpretation of the instructions seems unlikely. In any event, such reasoning would appear consistent with the natural and probable consequences rule itself, which extends accomplice liability to the perpetrator's reasonably foreseeable crimes regardless of whether the defendant personally harbored the specific intent required for commission of the charged, nontarget offense. (See *People v. McCoy*, *supra*, 25 Cal.4th at p. 1118, fn. 1; *People v. Prettyman* (1996) 14 Cal.4th 248, 261.)

Nor did the court err in instructing on proof of defendant's intent to inflict pain on the victim with respect to the torture-murder special circumstance. The instruction explicitly required a finding "defendant" intended to inflict extreme pain and suffering on the victim, precluding the jury from resting a true finding on the theory that only Hardy or Armstrong actually intended to torture Sigler.[6]

---

[6] Again, defendant did not object to the prosecutor's statement to the contrary in jury argument and does not now contend it was misconduct.

## C. Instruction on Personal Intent to Kill Under the Torture-murder Special Circumstance

The court did err, however, in its instructions on *intent to kill* as related to the torture-murder special circumstance. That charge is not one of the felony-murder special circumstances set out in section 190.2, subdivision (a)(17). Rather, as set out separately in subdivision (a)(18) of the same statute, the torture-murder special circumstance requires proof "[t]he murder was intentional and involved the infliction of torture." Under subdivision (c) of section 190.2, a defendant who aided and abetted the murder but was not the actual killer is generally eligible for capital punishment only if he or she acted with the intent to kill. The exception in subdivision (d) of the same statute, allowing a true finding for a nonkiller defendant who acts as a "major participant" in a predicate felony and with "reckless indifference" to human life, applies only to the felony-murder special circumstances listed in section 190.2, subdivision (a)(17) and not to the torture-murder special circumstance set out in subdivision (a)(18).

The trial court therefore erred in including torture in the list of felonies on which the jury could base a felony-murder special circumstance under section 190.2, subdivision (a)(17), and as to which the jury needed to find only that defendant, if not the actual killer, acted as a major participant and with reckless indifference to human life. This instruction (CALJIC No. 8.80.1 (1997 rev.)) was proper as to the charged felony-murder special circumstances based on the predicate felonies of robbery, kidnapping, rape, and foreign object rape (see § 190.2, subd. (a)(17)(A)-(C), (K)), but incorrectly described the mental state element of the torture-murder special circumstance (*id.*, subd. (a)(18)), which requires the intent to kill, regardless of whether the defendant personally killed the victim or assisted an accomplice in doing so.

19

We are unable to conclude beyond a reasonable doubt (*People v. Jennings*, *supra*, 50 Cal.4th at pp. 676-677; *People v. Williams* (1997) 16 Cal.4th 635, 689) that the court's instructional error, the omission of an intent-to-kill requirement for an accomplice's liability under the torture-murder special circumstance, was harmless. The verdict form for the offense of murder asked the jury to make one of two findings, that defendant was "A. The Actual Killer; or [¶] B. An Aider and Abettor and had the intent to kill; or was a Major Participant and acted with reckless indifference to human life." The jury selected finding B. The jury thereby showed its reliance on an aiding and abetting theory. At the same time, the jury made no finding—it was asked to make none—as to whether defendant aided and abetted his accomplices' fatal acts with the intent to kill or merely with reckless indifference to the victim's life.[7]

No other instructions supplied the missing element. As previously discussed, the standard instruction on aiding and abetting (CALJIC No. 3.01) was given, but it expressly related to "the commission of a crime," not the truth of a special circumstance allegation; the jury was not likely to read it as displacing the instruction that expressly defined the required mental state for aiding and abetting acts constituting a special circumstance (CALJIC No. 8.80.1), which erroneously told them the torture-murder special circumstance, like the felony-murder special circumstances, could be found true even if defendant acted only with reckless indifference to human life. An instruction on the torture-murder special

---

[7]    As to the torture-murder special circumstance itself, the jury found, in the ungrammatical and confusing language provided on the verdict form, "that the defendant, KEVIN DARNELL PEARSON, committed the murder of PENNY SIGLER was intentional and involved the infliction of torture." This falls short of a finding defendant personally intended to kill Sigler.

20

circumstance (CALJIC No. 8.81.18) required the jury to find "[t]he murder was intentional," but not necessarily to find defendant personally harbored the intent to kill.

The instructional conflation of the torture-murder special circumstance (§ 190.2, subd. (a)(18)) with the felony-murder special circumstances (*id*., subd. (a)(17)) carried over to the jury arguments. The prosecutor's summation reinforced the instruction's erroneous aspect. In describing "the special circumstance rule," the prosecutor told the jury they should find a special circumstance true if they found defendant had the intent to commit or aid and abet the commission of any of several felonies, including torture, and acted as an aider and abettor in the killing (she conceded it was unproven defendant was the actual killer) with *either* the intent to kill or reckless indifference to human life. Defense counsel's jury argument did nothing to explain the difference between torture and other felonies in this respect.

Nor do we agree with the Attorney General that the error was harmless beyond a reasonable doubt because the evidence of defendant's intent to kill was overwhelming. While the evidence was legally sufficient to support a finding defendant intended to kill the victim had the jury made such a finding, the defendant's intent was subject to substantial factual dispute at trial. Given the evidence of defendant's intoxication and the conflicting narratives, in testimony and prior statements, of what defendant personally did to the victim, it was a live issue for the jury whether he acted with the intent to kill her or merely with reckless indifference to her life, the distinction erroneously blurred in the instruction. We cannot say beyond a reasonable doubt that the jury, if correctly instructed, would have found defendant acted with the intent to kill.

The torture-murder special circumstance must therefore be vacated. The error does not, however, require reversal of the judgment of death, because

21

numerous special circumstance findings remain, unaffected by the instructional error. "There is no likelihood that the jury's consideration of the mere existence of the torture-murder special circumstance tipped the balance toward death." (*People v. Mungia* (2008) 44 Cal.4th 1101, 1139.) In a later part of the discussion, however, we conclude the penalty judgment must be reversed because of error in death-qualifying the jury. (See pt. IX., *post.*)

## V. Instructions on Felony-murder Special Circumstances

On the charged special circumstances of murder in the commission of robbery, kidnapping, rape, and foreign object rape (see § 190.2, subd. (a)(17)(A)-(C), (K)), the jury was correctly instructed through CALJIC No. 8.80.1 on defendant's required mental state as an aider and abettor of the murder. Defendant complains, however, that the proper effect of this instruction was "neutralized" by the giving of an additional instruction on the same charges, a version of CALJIC No. 8.81.17 that told the jury the felony-murder special-circumstance allegations required proof "[t]he murder was committed while the defendant was engaged in or was an accomplice in the commission of" the listed predicate felonies, without any mention of a requirement that defendant, if an aider and abettor in the murder, intended to kill the victim or acted in reckless disregard of her life, as required under CALJIC No. 8.80.1. Defendant contends that because of CALJIC No. 8.80.1's length and complexity, and the CALJIC No. 8.81.17 version's relative shortness and simplicity, the jury was likely misled about the mental state required of a defendant who was not the actual killer.

We disagree. The instructions did not conflict, and CALJIC No. 8.80.1, while somewhat complicated, was not "impenetrable" or "unintelligible," as defendant suggests. The jury was not likely to understand the simpler CALJIC No. 8.81.17 as negating or displacing CALJIC No. 8.80.1, but rather as

22

supplementing it. As the Attorney General suggests, the two instructions, read together, outline respectively the relationship of the murder to the predicate felony (CALJIC No. 8.81.17) and the mental state required for either an actual killer or an aider and abettor in the murder (CALJIC No. 8.80.1). The instructions as a whole posed no reasonable likelihood (*People v. Kelly* (1992) 1 Cal.4th 495, 525) of jury confusion on the point defendant identifies.

## VI. Failure to Instruct on Voluntary Intoxication in Relation to the Specific Intent to Torture

The offense of torture (§ 206) requires that the perpetrator act with "the intent to cause cruel or extreme pain and suffering for the purpose of revenge, extortion, persuasion, or for any sadistic purpose . . . ." As the Attorney General acknowledges, this mental state element describes a specific intent rather than general criminal intent. (*People v. Burton* (2006) 143 Cal.App.4th 447, 451-452.)

At defense request, the trial court instructed the jury, through CALJIC No. 4.21.1, that they were to consider evidence of defendant's voluntary intoxication in deciding whether defendant possessed a required specific intent. The court's instruction, however, expressly applied only to the charged offenses of murder, robbery, and kidnapping for rape.[8] Defendant contends the omission of torture from this list of specific intent offenses on which his voluntary intoxication could be considered was prejudicial error.

Although a trial court has no sua sponte duty to give a "pinpoint" instruction on the relevance of evidence of voluntary intoxication, "when it does

---

[8]     Without discussion of the point, counsel for both parties agreed with the trial court's statement, during discussion of jury instructions, that only these three offenses involved specific intent, while the remaining counts charged general intent crimes.

23

choose to instruct, it must do so correctly." (*People v. Castillo* (1997) 16 Cal.4th 1009, 1015.) We apply the "reasonable probability" test of prejudice to the court's failure to give a legally correct pinpoint instruction. (*People v. Hughes* (2002) 27 Cal.4th 287, 362-363.)[9]

No such reasonable probability of prejudice appears here. While there was evidence defendant had consumed alcohol and smoked marijuana at Gmur's house during the evening before the attack on Sigler, and some evidence defendant was intoxicated when he left Gmur's house, the jury necessarily determined any such intoxication did not prevent defendant from forming the specific intent to permanently deprive Sigler of her property or the specific intent to rape her, mental states the jury was instructed were required for conviction of robbery and kidnapping for rape, respectively. They reached these conclusions despite being instructed, through CALJIC No. 4.21.1, to consider voluntary intoxication on the question of whether defendant held these specific intents. That a more fully instructed jury would nonetheless have determined defendant was too intoxicated to intend causing Sigler extreme pain and suffering when he participated or assisted in kicking and stomping on her, raping her, and sexually penetrating her repeatedly with a wooden stake is very unlikely. The brutal beating and foreign object rape defendant and his companions inflicted on the victim would obviously cause her great pain, a fact of which even an intoxicated assailant could hardly be unaware. Indeed, defendant testified he knew the victim was in pain during the

---

[9] The failure to give a fully inclusive pinpoint instruction on voluntary intoxication did not, contrary to defendant's contention, deprive him of his federal fair trial right or unconstitutionally lessen the prosecution's burden of proof. (See *People v. Saille* (1991) 54 Cal.3d 1103, 1117-1120 [voluntary intoxication as negating specific intent sets out neither a defense nor a general principle of law on which instruction must be given sua sponte].)

assault as she pleaded for help in a voice "like a gurgle."  We see no reasonable probability the jury, if instructed to consider evidence of intoxication on the question, would have found other than it did on defendant's intent to cause the victim extreme pain and suffering.

Defendant points out the torture count was also omitted from instructions on concurrence of act and specific intent (CALJIC No. 3.31) and on proof of specific intent by circumstantial evidence (CALJIC No. 2.02).  These additional asserted errors, defendant argues, closed "every doorway" against the jury's consideration of voluntary intoxication on the question of defendant's intent to cause the victim extreme pain.  Our conclusion on prejudice is unchanged, however.  Even had the doorway been fully opened to a determination that defendant's voluntary intoxication prevented him from forming the specific intent to cause the victim extreme pain, it is not reasonably likely the jury would have walked through it.

## VII. Instructions Affecting Requirement of Proof Beyond a Reasonable Doubt

Defendant contends standard instructions given on consideration of circumstantial evidence (CALJIC Nos. 2.01, 2.02, 8.83, 8.83.1) and other standard instructions on weighing and assessing evidence on various issues (CALJIC Nos. 1.00, 2.21.1, 2.21.2, 2.22, 2.27, 2.51, 8.20) unconstitutionally vitiated the requirement of proof beyond a reasonable doubt (on which the jury was properly instructed through CALJIC No. 2.90) by suggesting factual questions were to be resolved on the basis of merely reasonable interpretations of the evidence or by the preponderance of evidence.  We have repeatedly rejected these contentions, and defendant adds nothing to warrant reexamining our conclusions.  (See, e.g., *People v. Moore* (2011) 51 Cal.4th 386, 414-415; *People v. Brasure* (2008) 42 Cal.4th

25

1037, 1058-1059; *People v. Kelly* (2007) 42 Cal.4th 763, 792; *People v. Nakahara* (2003) 30 Cal.4th 705, 713-714.)

### VIII. Cumulative Prejudice

Defendant contends the cumulative effect of errors at the guilt and special circumstances phase of the trial was to render that trial fundamentally unfair. We have concluded that the jury findings that defendant personally used a deadly weapon were unsupported by substantial evidence (pt. III., *ante*), and that the jury was misinstructed on torture as a predicate felony for first degree felony murder (pt. IV.A., *ante*), on the mental state requirement of the torture-murder special circumstance (pt. IV.C., *ante*), and on the relevance of voluntary intoxication to the offense of torture (pt. VI., *ante*). While these conclusions require the personal use findings to be stricken and the torture-murder special circumstance reversed, even taken together they do not undermine the fairness of the trial as a whole or affect any other portion of the judgment.

### IX. Erroneous Excusal of Prospective Jurors for Cause

Defendant contends the trial court erred in granting five prosecution challenges for cause during the death-qualification portion of jury selection. Applying well-established constitutional standards, we agree as to one of the prospective jurors, identified here by her initials, C.O. Because that error requires reversal of the judgment as to penalty, we do not address the propriety of excusing the other prospective jurors defendant identifies.

"Past decisions of the United States Supreme Court and this court establish that '[a] prospective juror may be challenged for cause based upon his or her views regarding capital punishment only if those views would " 'prevent or substantially impair' " the performance of the juror's duties as defined by the court's instructions and the juror's oath. (*Wainwright v. Witt* [(1985)] 469 U.S.

26

412, 424 [83 L.Ed.2d 841, 105 S.Ct. 844]; *People v. Crittenden* (1994) 9 Cal.4th 83, 121 [36 Cal.Rptr.2d 474, 885 P.2d 887]; *People v. Mincey* (1992) 2 Cal.4th 408, 456 [6 Cal.Rptr.2d 822, 827 P.2d 388].) " ' "A prospective juror is properly excluded if he or she is unable to conscientiously consider all of the sentencing alternatives, including the death penalty where appropriate." [Citation.]' [Citation.] In addition, ' "[o]n appeal, we will uphold the trial court's ruling if it is fairly supported by the record, accepting as binding the trial court's determination as to the prospective juror's true state of mind when the prospective juror has made statements that are conflicting or ambiguous." [Citations.]' " [Citation.]' (*People v. Cunningham* (2001) 25 Cal.4th 926, 975 [108 Cal.Rptr.2d 291, 25 P.3d 519].)" (*People v. Heard* (2003) 31 Cal.4th 946, 958.) When the juror has not made conflicting or equivocal statements regarding his or her ability to impose either a death sentence or one of life in prison without the possibility of parole, the court's ruling will be upheld if supported by substantial evidence. (*People v. Horning* (2004) 34 Cal.4th 871, 896-897.)

The United States Supreme Court recently reiterated the applicable principles as follows: "First, a criminal defendant has the right to an impartial jury drawn from a venire that has not been tilted in favor of capital punishment by selective prosecutorial challenges for cause. *Witherspoon* [*v. Illinois* (1968)], 391 U.S., at 521 . . . . Second, the State has a strong interest in having jurors who are able to apply capital punishment within the framework state law prescribes. [*Wainwright v.*] *Witt*, [*supra*,] 469 U.S., at 416 . . . . Third, to balance these interests, a juror who is substantially impaired in his or her ability to impose the death penalty under the state-law framework can be excused for cause; but if the juror is not substantially impaired, removal for cause is impermissible. *Id.*, at 424 . . . . Fourth, in determining whether the removal of a potential juror would vindicate the State's interest without violating the defendant's right, the trial court

27

makes a judgment based in part on the demeanor of the juror, a judgment owed deference by reviewing courts. *Id.*, at 424-434 . . . ." (*Uttecht v. Brown* (2007) 551 U.S. 1, 9.)

On her questionnaire, C.O. indicated she wished to serve and thought she could be an impartial juror because she was unbiased and believed in "[f]airness to the defense and prosecution." Asked for her general feelings about the death penalty, she wrote she had none, adding that she had thought about the "negatives & positives but I came to no conclusions." She did not "yet" have a view on whether California should have a death penalty, but when asked if the state should "abolish" the penalty today, she checked "no" and explained that she thought the penalty might deter some people from committing crimes. C.O. did not believe either death or life without parole should be mandatory in all murder cases, because "not all murder cases are the same." It would not be impossible for her to vote for or against death in every case, and she would not automatically vote for either sentence regardless of the evidence presented.

Question No. 188 of the questionnaire was as follows: "Some people say they support the death penalty; yet could not personally vote to impose it. Do you feel the same way?" C.O. checked "no" and wrote in explanation: "I'm not sure where I stand but if I strongly felt strong about something, I would stand behind it."

Question No. 228 of the questionnaire was as follows: "Please describe what you have seen, read, or heard about the death penalty from any source (TV, radio, friends, newspapers, etc.)." C.O. wrote in response: "I've heard that people are claiming this to be cruel & unusual punishment because that person actually knows when they are going to die." To a followup question asking for her reaction to what she had heard or read (question No. 228A), C.O. wrote: "I don't think that is cruel and unusual punishment. But I'm uncertain if I approve or

28

disapprove w/ death sentence." A second followup (question No. 228B) asked whether she could set aside whatever she had heard or read and decide the punishment based only on the evidence at trial; C.O. checked "yes."

On examination by defense counsel, C.O. reiterated her questionnaire view that the death penalty was appropriate in some cases and, asked whether she could actually vote to impose it in an appropriate case, answered "yes." Presented with the premise that she and the other jurors had found defendant guilty of murder and had found true one or more allegations of "kidnap, torture, robbery, or sexual assault," C.O. agreed that she would have an "open mind" and no "pre-set feeling" as to which penalty to impose.

Asked what she meant by her answer to question No. 228A on the questionnaire (that she did not think the death penalty was cruel and unusual but was uncertain whether she approved or disapproved of it), C.O. said, "I think with that answer, because I'm uncertain of how I really feel about the death penalty, unless I had everything presented in front of me, so I don't know what I really meant on that one." On further questioning by defense counsel, she reiterated that she could vote for death in an appropriate case and agreed her uncertainty related to the appropriateness of the penalty in a given case, which she could not decide without hearing all the facts.

The prosecutor pressed C.O. to say whether she was "for or against the death penalty," adding that it would be unfair to both parties to seat her as a juror "if you truly, at this point in time, don't know what you will do." C.O. answered, "I think with that, I'd have to be an actual juror to see what's presented for me. I'm not saying that I can't vote for it or that I wouldn't vote for it, but I think that I have to have all of the evidence before I can say anything concerning this case itself."

29

The prosecutor said she understood, "[b]ut this is the time and place, we need to know whether or not you actually can vote for the death penalty" or whether C.O. was a person who, while supporting the penalty in the abstract, could never vote for it.  C.O. answered, "No, I could vote for it."  To the prosecutor's statement she did not have the feeling "that you are sure that you can," C.O. responded, "I am positive that I could."  When the prosecutor asked for her general feelings about the death penalty, C.O. said, "in some cases it should be given to people," giving as a possible example the murder of a child.

Finally, the prosecutor questioned C.O. about her answer to question No. 188 (quoted above), saying that "what we need to know right now is, you know, if you are for the death penalty and if you could vote for it or if you're not and you can't."  C.O. answered, "All I can say to that is that I can vote for it."

Over defense objection, the trial court granted the prosecutor's challenge for cause.  Expressly relying on the guidance of *People v. Guzman* (1988) 45 Cal.3d 915, which the trial court read as indicating prospective jurors may be excused "due to their equivocal views on capital punishment," the court found C.O. had given "equivocal" and "conflicting" responses about capital punishment, "and, therefore, she would not be an appropriate juror in this particular case." Later, in denying defendant's motion for a new trial, the court focused particularly on C.O.'s answer to question No. 188 of the questionnaire.  "Given that she has no such strong feelings about the death penalty, the response to question 188 seemingly supports this court's finding regarding her state of mind that she is equivocal on her equivocal view on capital punishment and conflicting and equivocal responses regarding the imposition of the penalty of death.  [¶] . . . [¶] Since this juror had no strong feelings on the death penalty, by her own statements, she could not stand behind them.  Therefore, when asked whether she's one that supports the death penalty, but yet couldn't impose it, this juror

30

responded quote, 'I'm not sure where I stand,' close quote. [¶] This series of responses, coupled with her affirmation of the responses during voir dire, gives this court a view of her state of mind, shows an equivocal view on the imposition of the death penalty, and supports this court's grant of a challenge for cause."

We conclude the record does not support the trial court's finding that C.O.'s views regarding the death penalty would prevent or substantially impair the performance of her duties as a juror. Contrary to the trial court's impression, C.O. made no conflicting or equivocal statements about her ability to vote for a death penalty in a factually appropriate case. In the absence of such contradictions or equivocation, the trial court's ruling is reviewed for substantial evidence (*People v. Horning*, *supra*, 34 Cal.4th at pp. 896-897), of which we find none.

None of C.O.'s answers on the questionnaire or in voir dire suggested views that would substantially impair her ability to perform her duties by voting to impose the death penalty in an appropriate case. Her general views on the death penalty were vague and largely unformed, though she thought it sometimes served the purpose of deterrence and so should not be abolished. But on whether she could vote to impose it, her responses were definite and consistent. According to the questionnaire, she would *not* vote automatically for life in prison regardless of the evidence; she would *not* find it impossible to vote for death in every case; she *could* set aside whatever she had heard about the death penalty outside of court and decide defendant's punishment based only on the evidence at trial; and she was *not* a person who, while supporting the death penalty, could not vote to impose it. On voir dire, C.O. repeated several times that she could vote for death in an appropriate case. She never wavered on this point, and when the prosecutor expressed skepticism, C.O. reassured her, "I am positive that I could."

The trial court thought C.O. disqualified because of her "equivocal views on capital punishment," citing *People v. Guzman*, *supra*, 45 Cal.3d 915, as

31

authority. But *Guzman* is inapposite. There, both disputed prospective jurors had made statements indicating *they would be unable to vote for death* and would instead choose life imprisonment in every case. (*Id.* at pp. 955-956.) In upholding the challenges for cause, we rejected the defense argument that these statements, "because preceded by statements such as 'I believe' and 'I think,' " were insufficient to support a finding of substantial impairment. (*Id.* at p. 956.) The prospective jurors' statements showed their substantial impairment *in spite of* the statements' qualified nature, not *because* of it.

*Guzman* does not stand for the idea that a person is substantially impaired for jury service in a capital case because his or her ideas about the death penalty are indefinite, complicated or subject to qualifications, and we do not embrace such a rule. As the high court recently reminded us, "a criminal defendant has the right to an impartial jury drawn from a venire that has not been tilted in favor of capital punishment by selective prosecutorial challenges for cause." (*Uttecht v. Brown*, *supra*, 551 U.S. at p. 9.) Personal opposition to the death penalty is not itself disqualifying, since "[a] prospective juror personally opposed to the death penalty may nonetheless be capable of following his oath and the law." (*People v. Kaurish* (1990) 52 Cal.3d 648, 699.) It follows the mere *absence* of strong, definite views about the death penalty is not itself disqualifying, since a person without strong general views may also be capable of following his or her oath and the law.

To the extent the trial court excused C.O. because of what the court characterized as "equivocal" views on the merits of the death penalty itself, the court rested its ruling on an erroneous view of the law. C.O.'s possession of such views (more accurately described as vague, indefinite or unformed) did not itself disqualify her from service in this case, so long as she could follow her oath to

32

conscientiously consider the death penalty. As explained above, her responses on that point were unequivocally affirmative.

As already noted, the trial court, in denying defendant's motion for a new trial, focused particularly on C.O.'s answer to question No. 188 of the questionnaire.[10] The trial court expressed concern that because C.O. had no strong views on the death penalty and was not sure where she stood on it, she would not "stand behind it," as she wrote she would stand behind something about which she felt strongly. This concern was misplaced, however, as the role of a capital case juror is not to "stand behind" either penalty but to assess the evidence, weigh the aggravating and mitigating circumstances, deliberate with the other jurors, and choose the appropriate penalty. (*People v. Demetrulias* (2006) 39 Cal.4th 1, 41.) On her ability to perform this duty, C.O.'s responses were clear and unequivocal.

To exclude from a capital jury all those who will not promise to immovably embrace the death penalty in the case before them unconstitutionally biases the selection process. So long as a juror's views on the death penalty do not prevent or substantially impair the juror from "conscientiously consider[ing] all of the sentencing alternatives, including the death penalty where appropriate" (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1146), the juror is not disqualified by his or her failure to enthusiastically support capital punishment.

Observing that C.O. said she would like to serve as a juror, the Attorney General argues the trial court may have determined from her response to question

---

**10** For convenience, we repeat the question and answer. Question No. 188 read: "Some people say they support the death penalty; yet could not personally vote to impose it. Do you feel the same way?" C.O. checked "no" and wrote in explanation: "I'm not sure where I stand but if I strongly felt strong about something, I would stand behind it."

No. 188 and her other answers that she "was someone who was uncertain about whether she could personally impose the death penalty but seemingly gave correct answers because she wanted to sit on the jury." This hypothesis fails in two respects. First, the trial court made no such finding about C.O.'s state of mind; while the court at one point mentioned C.O.'s desire to serve as a juror, the court did not find she was giving deceptive responses in order to do so. Second, nothing in C.O.'s response to question No. 188 indicated uncertainty about her ability to impose the death penalty. Asked whether she was a person who, while supporting the penalty, could not personally vote to impose it, C.O. answered "no," suggesting, consistent with her other responses, that she *could* personally impose the penalty. She elaborated by explaining that, unlike the type of person identified in the question, she stood behind her strong beliefs—she would not say one thing and do another. In other responses, C.O. consistently indicated she could and would conscientiously consider both possible penalties and could personally vote to impose death if she found it appropriate to the case, going so far as to tell the prosecutor she was "positive" she could vote to impose the death penalty. Her answer to question No. 188 did not contradict or undermine these responses.

We conclude the trial court's finding that C.O.'s views on imposition of the death penalty would prevent or substantially impair the performance of her duties as a juror is not supported by substantial evidence. By erroneously excusing C.O. for cause, the trial court denied defendant the impartial jury to which he was entitled under the Sixth and Fourteenth Amendments to the United States Constitution. (*Uttecht v. Brown*, *supra*, 551 U.S. at pp. 6, 9.) "Furthermore, the governing high court decisions also establish that although such an error does not require reversal of the judgment of guilt or the special circumstance findings, the error does compel the *automatic reversal* of defendant's death sentence, and in that respect the error is not subject to a harmless-error rule, regardless whether the

34

prosecutor may have had remaining peremptory challenges and could have excused Prospective Juror [C.O.]." (*People v. Heard*, *supra*, 31 Cal.4th at p. 966.)

## X. Determinate Sentencing Issues

Defendant contends the trial court erred under section 654 in imposing multiple enhancements for the use of a single deadly weapon, the stake with which Sigler was beaten and sexually assaulted, imposing sentence on both forcible rape in concert (count 4; § 264.1) and forcible rape (count 5; § 261), imposing sentence on both foreign object penetration in concert (count 6; § 264.1) and foreign object penetration (count 7; § 289, subd. (a)(1)), and imposing sentence for any felony except first degree murder.

As we earlier concluded (pt. III., *ante*), the evidence was insufficient to support the jury findings that defendant personally used the stake in any of the charged felonies. Because those findings must be vacated, we need not decide whether sentence was properly imposed on more than one personal use enhancement.

The Attorney General concedes the trial court erred in imposing sentence for both forcible rape in concert (count 4) and forcible rape (count 5); we agree, as the evidence showed only a single indivisible act of intercourse. We also conclude section 654 did not prohibit sentencing defendant on both foreign object penetration in concert (count 6) and foreign object penetration (count 7). According to defendant's testimony, Hardy and Armstrong *each* sexually assaulted Sigler with the stake, in separate penetrations; the perpetrators of these distinct crimes could each be punished for them. (See *People v. Harrison* (1989) 48 Cal.3d 321, 335-338 [§ 654 did not bar perpetrator's punishment for each of three forcible sexual penetrations committed in sequence].) Thus, two separate, individually punishable criminal acts were committed, and defendant was found

35

criminally liable for each of them under the law of complicity. Punishing him for both does not violate section 654.

Finally, defendant is clearly wrong that the trial court could sentence him only on murder. The robbery and sexual assaults were pursued with different criminal objectives than the murder and could be separately punished. (*People v. Latimer* (1993) 5 Cal.4th 1203, 1207-1209, 1216.)

Because the trial court must resentence defendant in a manner consistent with this opinion (vacating the personal use enhancements and staying imposition of sentence for one count under § 654), we need not decide whether the court's imposition of the upper term on counts 2, 4, 6 and 7 violated defendant's jury trial rights under *Cunningham v. California* (2007) 549 U.S. 270, or whether any such error was harmless. On remand, the trial court is to exercise its sentencing discretion as described in *People v. Sandoval* (2007) 41 Cal.4th 825, 843-852.

**DISPOSITION**

The judgment is reversed as to the sentence of death, the jury's findings that defendant personally used a dangerous or deadly weapon (§§ 667.1, 12022, 12022.3), the jury's true finding on the special circumstance of murder with the infliction of torture (§ 190.2, subd. (a)(18)), and the state prison sentence. The judgment is otherwise affirmed. The case is remanded to the trial court for a new penalty trial and for resentencing in a manner consistent with our opinion.

**WERDEGAR, J.**

**WE CONCUR:**

**CANTIL-SAKAUYE, C. J.**
**KENNARD, J.**
**BAXTER, J.**
**CHIN, J.**
**CORRIGAN, J.**
**LIU, J.**

36

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** People v. Pearson
_____

**Unpublished Opinion**
**Original Appeal** XXX
**Original Proceeding**
**Review Granted**
**Rehearing Granted**

_____

**Opinion No.** S120750
**Date Filed:** January 9, 2012
_____

**Court:** Superior
**County:** Los Angeles
**Judge:** Tomson T. Ong

_____

**Counsel:**

Conrad Petermann, under appointment by the Supreme court, for Defendant and Appellant.

Edmund G. Brown, Jr., and Kamala D. Harris, Attorneys General, Dane R. Gillette, Chief Assistant Attorney General, Pamela C. Hamanaka, Assistant Attorney General, Sharlene A. Honnaka and Yun K. Lee, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Conrad Petermann
Law Office of Conrad Petermann
323 East Matilija Street, Suite 110
Ojai, CA  93023
(805) 646-9022

Yun K. Lee
Deputy Attorney General
300 South Spring Street, Suite 1702
Los Angeles, CA  90013
(213) 897-2051