Filed 11/20/15  P. v. Rascon CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D068510 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. FBA1000308) |
| CESAR OMAR GONZALES RASCON, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Bernardino County, Debra Harris, Judge.  Affirmed as modified with directions.

Richard A. Levy, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Julie L. Garland, Assistant Attorney General, Peter Quon, Jr. and Marilyn L. George, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted Cesar Omar Gonzales Rascon of first degree murder (Pen. Code,[1] § 187, subd. (a); count 1), forcible rape (§ 261, subd. (a)(2); count 2), and kidnapping to commit rape (§ 209, subd. (b)(1); count 3).  As to count 1, the jury found true special circumstance allegations that the murder was committed while the defendant was engaged in the commission of a rape and a kidnapping (§ 190.2, subd. (a)(17)(B), (C)).  As to count 2, the jury found true the special allegation that the rape was committed during the commission of a kidnapping (§ 667.61, subds. (a), (d)).  The trial court sentenced Rascon to life in prison without the possibility of parole on count 1, 25 years to life on count 2, a life term on count 3, and stayed the sentences on counts 2 and 3 under section 654.

Rascon contends the trial court prejudicially erred by (1) failing to respond to or notify counsel of a jury question; (2) failing to instruct the jury on the lesser included offense of false imprisonment; and (3) instructing the jury not to consider voluntary intoxication on the premeditation allegation and the kidnapping theory of first degree felony murder.  Rascon further challenges the sufficiency of the evidence of rape of an intoxicated person for purposes of the rape special circumstance and rape felony murder; the element of force or fear for purposes of the count 3 kidnapping and related special allegations; and forcible rape.  Rascon contends the jury's "One Strike" finding as to count 2 must be stricken because the operative information did not plead it with a qualifying underlying crime.  Finally, Rascon raises various sentencing errors as to his

---

1       Statutory references are to the Penal Code unless otherwise specified.

2

actual conduct credits, a $7,500 parole revocation restitution fine, and the amount of a section 1202.4 restitution fine. The People concede that Rascon is entitled to 1,483 days of actual conduct credits and that the parole revocation restitution fine should be stricken from the abstract of judgment.

We agree the judgment must be modified to reflect that Rascon is awarded 1,483 days of actual conduct credits. We further agree with the People that the record reflects the trial court imposed a $10,000 restitution fine under section 1202.4. However, we disagree with the People's concession that Rascon's parole revocation restitution fine should be stricken from the abstract of judgment. We order the abstract modified to reflect a $10,000 parole revocation restitution fine, and affirm the judgment as modified.

FACTUAL AND PROCEDURAL BACKGROUND

*Prosecution Evidence*

In May 2010, Melissa Curley and her boyfriend Jason Henry were staying in room 108 at a motel in Barstow, where they lived temporarily for Henry's work after traveling from Arizona, where Henry resided. Curley and Henry had been dating a little over two years. Curley's two young children were with Curley's mother in Arizona. One of Henry's coworkers, Stewart Johnson, was staying in a room a few doors down from them. On Friday May 14, 2010, Henry left for Arizona without Curley, about which he and Curley had a disagreement as they had planned to return to Arizona together to celebrate Mother's Day.

At about 10:00 that night, Johnson was awakened in his room by Curley knocking at his door. Johnson only knew Curley through Henry; he considered her a good

3

acquaintance. Curley and Johnson talked, then Curley asked Johnson to go to a bar with her. Johnson initially declined because he had been to the bar earlier that evening, was still intoxicated, and had things to do in the morning, but Curley, who was herself "pretty buzzed," talked him into going back. Johnson drove to the Costa Azul restaurant across from the motel, where they had drinks and danced. Curley eventually walked away from Johnson and sat at the bar where other men were sitting or playing pool. Johnson recalled that Rascon was one of the men playing pool. Johnson later found Curley slumped over the bar and talking to the bartender. Johnson told Curley it was time to leave, but Curley was "belligerently drunk," incoherent, and wasn't listening to him; she was referring to the bartender as her mother.[2] He described Curley as "very sad."

When the bar closed, Johnson asked the bartender to help him take Curley outside; he could not carry her and she was arguing and fighting with him. The bartender and her husband helped coax Curley out of the bar, but when they reached Johnson's truck, Curley refused to get in. Eventually the bartender got Curley to enter the truck, and Johnson drove back to the motel. Because Curley could not find her room key, Johnson went to the office to get the manager, and the manager arranged for the motel owners to bring a key. The manager and one of the owners observed Curley leaning on her truck and barely standing; she appeared to be crying or sobbing. Johnson and the manager

_____

[2]    At this point, Johnson was asked about Curley's level of intoxication and the reporter's transcript reflects his response as follows: "I don't know. Belligerently drunk. Coherent (*sic*). She wasn't listening to me. She didn't want to listen to anybody. She just kept talking about the barmaid being her mother." (Italics added.) The "sic" reflects the court reporter's belief that Johnson was actually trying to say that Curley was incoherent.

pleaded with Curley to get in her room and go to sleep, but she refused. Fed up because Curley was not listening to him, Johnson gave up and returned to his own room. As he did so, he saw Rascon in front of room 107 at the motel, and recognized him from the restaurant. The motel owner and manager also saw a man standing by room 107; the manager recognized him as Rascon and saw him staring at Curley. A few minutes after Johnson entered his own room, he left to check that he had locked his truck, and heard voices laughing or talking from Rascon's room. Johnson returned to his room and passed out.

The next morning, Johnson saw Curley's wallet on his truck's dashboard, so he walked to her room and found the door ajar and the room empty. He asked the manager to open the door to Rascon's room so he could see if Curley was in there, but the manager refused because it was not yet check out time. After waiting a few minutes, Johnson tried the door to Rascon's room, and opened it to find Curley lying prone on the floor behind the door, wearing only a tank top. He called out Curley's name and tried to move her wrist, which was ice cold and cracked like "something you would break in ice . . . ." Johnson ran outside, got the manager and called police.

A responding police corporal found Curley face down with her arms crossed above her head and her legs crossed, seemingly positioned that way. Also on the floor were a banana peel, a piece of banana, what appeared to be a used condom, a pair of women's jeans and a pair of tennis shoes. Partially consumed beer bottles were on the table. A deputy coroner observed Curley had abrasions and bruising to her face, lips and mouth area, and there was feces on the back side of her legs as well as the front of her

5

body.  Curley's top and sports bra were pulled up above her breasts.  She had an abrasion on her knee.

Barstow Police Detective Leo Griego viewed surveillance video from motel cameras recording that night.  According to the detective, the recordings showed that after Johnson and the motel manager left Curley, a male adult came out of room 107 and approached her.  As the man turned away from Curley, she fell forward onto the sidewalk in front of her truck, directly in front of room 107.  Images on the video led investigators to a red older model Toyota station wagon, which was eventually located at an auto dealer.  Based on information provided to him there, Detective Griego went to a truck stop in Yermo where he asked for "Cesar" and was directed to Rascon, who was near some dumpsters carrying a small trash can.

Detective Griego interviewed Rascon, who told the detective his name was Jorge Machuco and that he drove a blue Honda.  Rascon initially denied being with Curley and claimed he was elsewhere with another woman named Flaca.  After the detective presented Rascon with his motel registration, he admitted he was there with Curley and they shared some kisses but he claimed they did not have sex.  He stated that when he left the room, Curley was sleeping on the floor in her clothing.  Rascon told Detective Griego that earlier that day or evening he used condoms to have intercourse with Flaca.[3]  He

---

[3]    That woman, who detectives found and identified as Nancy Alcazar, was brought to the room of the annex where Rascon was being questioned and denied having sex with him.  She testified similarly at trial.

later told Detective Griego that when Curley entered the room, he cleaned blood off her, and when he left the room, Curley was seated and crying, wearing her pants and shirt.

Detective Griego moved Rascon to a police annex for additional questioning, where Rascon continued to deny having intercourse with Curley. Rascon said that when he cleaned the blood off her, Curley kissed him once on the lips. He denied touching or kissing her chest or removing her clothes. He continued to say that Curley was crying when he left the motel room. He denied killing her. Detective Griego asked Rascon whether when Curley entered the room, it was because she "wanted to, or you pulled her or forced her into the room." Rascon responded, "No, I grabbed her hand."

Manuel Losano worked at the auto dealer where Rascon's red Toyota was found. Losano knew Rascon, who lived in a motor home on the property. He testified that the night before police came to talk with him about Rascon's car, Rascon arrived at the dealership at about 10:00 p.m. or 11:00 p.m. with a carton of beer in his hand. Rascon told Losano he had killed a man and needed a ride. Losano did not believe Rascon; Losano told Rascon that he (Losano) was drunk and could not drive Rascon.

Javier Alvarado had known Rascon for about a month in May 2010. He recalled that police spoke to him about Rascon's red Toyota in May 2010, and testified that the night before he spoke to police, Rascon showed him Curley's driver's license and told him she was his new girlfriend. The next time Alvarado saw the driver's license was when Detective Griego showed it to him.

Annette Elizondo worked at the Yermo truck stop and helped Rascon get a maintenance job there. On the morning of Saturday, May 15, 2010, she was told Rascon

7

did not show up for work the night before, and after she found him at the auto dealer, she picked him up because he said he needed a ride. Rascon told Elizondo he did not appear at work for his 6:00 p.m. to 10:00 p.m. shift because his station wagon had broken down. Rascon worked the 11:00 a.m. to 5:00 p.m. shift that Saturday. Two weeks later, Elizondo was working at the truck stop and changing plastic liners in the trash cans when she found Curley's driver's license laying flat under a trash bag. Because Elizondo had already been interviewed by Detective Griego about the matter, when she saw Curley's name on the license, she called police.

A forensic pathologist who conducted Curley's autopsy observed a deep hemorrhage between Curley's thyroid cartilage and her hyoid bone, as well as a fracture of the thyroid cartilage on the right side of her neck and a fractured hyoid bone. He found a large piece of wadded up plastic in her throat that completely blocked her airway. The plastic was later described as similar in size and material to the bags used to line waste baskets at the Barstow motel. There were deep hemorrhages below Curley's collar bones that were not typically seen in a fall unless the fall was on some protrusion. Curley had a deep scalp hemorrhage on her scalp behind her ear, consistent with blunt force injury. She had other blunt force injuries: abrasions by her eye, nose, and upper lip; a small laceration of her upper eyelid; a bruise on her lip's inner surface; a bruise on her right chest, and a torn frenulum, which connects the upper gums to the upper lip. The pathologist found no evidence of trauma from sexual penetration or intercourse, but explained trauma may or may not be present depending on the roughness of the act. He

8

determined that Curley's death was a homicide caused by obstruction of her airway and strangulation.

Curley had a .29 percent blood alcohol level and a .40 percent level in her vitreous eye fluid, which indicated that at some point Curley's blood alcohol level was up to .40 percent, a potentially fatal level for most people. According to the pathologist, though some chronic alcoholics could "form an intent to go somewhere and get there" with such levels, albeit staggering and not walking normally, most people would be asleep or hard to rouse at a .29 percent blood alcohol level. The pathologist opined it was not physically possible for a person to force a wad of plastic down his or her own throat; despite having seen hundreds of suicides, he had never seen anyone use that method and it would be unreasonable to conclude Curley committed suicide in that manner.

A criminalist found that Rascon matched the profile of a major DNA contributor of sperm found in a vaginal swab taken from Curley, meaning the DNA locations were exactly the same. He identified Rascon as a major contributor of DNA found in a fingernail clipping from Curley's right hand, a possible minor contributor of another clipping, and a possible trace contributor in three of the fingernail samples. The criminalist excluded Henry, Johnson and the motel manager as the source of DNA in Curley's left hand clippings.

*Section 1118 Motion for Acquittal*

At the close of the People's case, Rascon moved under section 1118 for acquittal on the kidnapping and rape charges. Pointing out there was no sex-related trauma to Curley, he argued that the evidence was she was belligerent and able to resist her friends'

9

efforts to get her to leave the bar and get her into her room, and that the surveillance video could not reasonably be interpreted as showing a kidnapping. Before ruling on the matter, the court viewed the video surveillance in chambers with counsel. Thereafter, it denied the motion, ruling the video showed enough to raise a question of fact for the jury to decide whether Curley was pulling back or not and showing unwillingness to enter Rascon's room, and that there was enough evidence on the issue of consent to submit the question to the jury.[4]

*Defense Evidence*

Rascon, who cannot speak or understand English, testified in his defense through a Spanish interpreter. He testified he checked into the motel where he drank six beers and

---

[4] The trial court related events on the video, exhibit No. 123, as follows: "The exhibit will start at 9:15. This is where the evidence has indicated Mr. Johnson is back in his room. [The motel owner] on the left, and [the motel manager] appears to walk back towards the manager's office. [¶] You see at 9:40, the victim, who testimony has shown is severely intoxicated to the point of nearly being comatose or a lot of people would have been comatose, lean back against the truck. [¶] About 10:16 on the exhibit, you see the defendant approach her. [¶] There, at 10:28, you see him leaning towards his room and her learning [*sic*] with her upper body to his room. [¶] You see him point to his room at 10:35. You see her pull back up against the hood of the truck. [¶] Then, at 10:49, you see the defendant walk back to the steps in front of room 107. [¶] At 10:58, you see him approach her again. [¶] At 11:09 . . . you see her fall. [¶] 11:27, you see the defendant reach down and grab her, and she falls backwards away from him. [¶] At 11:34, you see her reach out her hand and doesn't seem to be grabbed by the defendant until 11:38. [¶] At that point at 11:46 . . . , she gets up, taken by the hand by the defendant. [¶] She pulls away at 11:50 and then is pulled into the defendant's room at 11:55." Defense counsel objected to the court's characterization of pulling, but the court only responded, "Okay." It then gave its ruling, which in part was that the evidence presented a question of fact for the jury: "[The jury] can decide that she was pulling back. She wasn't pulling back. That's up to them to decide. [¶] Both sides can argue what her movements meant, and I do find that that is an area that's sufficient for the jury: That I cannot rule out that the victim's motions was [*sic*] not an unwillingness to enter the room on her own accord."

10

rested; went to the bar that night to play pool, where he saw Curley and drank three or four more beers; and after returning to his motel room saw Johnson and the manager speaking with Curley outside the motel. Rascon could not understand any of their conversation. He claimed that while Curley was leaning against her truck, she made a "signal" for him to approach, then fell down and put out her hand. Rascon testified that he approached the truck but did not say anything to Curley and she did not say anything to him. According to Rascon, he tried to pick her up, but he wasn't able to because he had been drinking and she fell back down. Rascon testified he tried to help her by giving her his hand; Curley stretched out her hand, he grabbed it and managed to get her up. Rascon denied forcing Curley into his room, he testified that because Curley could not stand on her own, he got her hand and helped her into his room. Rascon testified that when he cleaned Curley off, they kissed, he removed her pants, she removed her underwear, and they had intercourse. He denied strangling, hitting, or tying Curley. He claimed that afterwards, Curley was on the carpet crying, and he left. Rascon denied using any weapons or threatening Curley. He testified that after his arrest and during Detective Griego's third interview, he told the detective he took Curley's pants off and had sex with her in the motel room. He testified Curley never said no to him; he did not use force against Curley to have sex with her and she was alive when he left the room.

When asked about Losano, who had quoted Rascon as saying he killed a man, Rascon testified he (Rascon) was talking about his car turning on and off. He denied wanting a ride to escape to Mexico. Rascon claimed he accidentally took Curley's driver's license and did not return it to her because he was called to work, and he put it in

11

the trash can because he was afraid of getting stopped with a stranger's identification card.

Defense expert forensic pathologist Harry Bonnell testified that Curley's cause of death was obstruction of her airway by the plastic bag in her throat. He found no evidence of strangulation or defensive wounds. Evidence that Curley's bladder was empty indicated to him she had been to the bathroom shortly before she died. Based on Curley's lividity and rigidity, he concluded her time of death was closer to 7:00 a.m. rather than 1:00 a.m. On cross-examination, Dr. Bonnell agreed that the absence of trauma to Curley's vaginal area did not necessarily exclude sexual penetration or rape.

The defense recalled Detective Griego, who testified that on May 17, 2010, Rascon admitted to him he had been drinking and had sex with Curley in the bed. When the detective asked Rascon whether Curley wanted to have sex with him, Rascon answered, "Of course." On cross-examination, Detective Griego recounted that Rascon had told him, "Of course I had to use force to get [Curley] up the step." Rascon also told the detective that Curley never took off her top. Rascon denied taking Curley's driver's license. Detective Griego testified that there were five unopened bottles of beer in the bathroom sink.

## DISCUSSION

### I. *Handling of the Jury's Question*

The jury began its deliberations on the afternoon of April 2, 2014. It resumed its deliberations at 9:00 a.m. the following day. At 9:28 a.m., the clerk received a note from one of the jurors stating: "We, the jury, in the above entitled action, request the

12

following: *Clarification of second degree murder*." (Italics representing the juror's handwriting.) Ten minutes later, the jury notified the court that it had reached a verdict. At 10:05 a.m., the court reconvened and took the verdicts. The minute order reflects the clerk's receipt of the juror note and the court's announcement that the jury had reached its verdict. The court did not acknowledge the juror note when it reconvened to hear the verdict.

Rascon contends his convictions must be reversed because the court failed to notify counsel about the juror's question or respond to it as it was required to do under section 1138.[5] He asserts there is no indication in the record that the clerk notified the court of the note, and thus we cannot rely on the presumption that the court's official duty had been regularly performed. (Evid. Code, § 664.) He also maintains, relying on out of state authority, it is irrelevant that the jury reached its verdicts without the court's assistance. Rascon argues the court's failure to exercise its discretion cannot be saved on the supposition it would have properly refused additional instructions. According to Rascon, the error is akin to an ex parte communication between the court and jury, violating his right to effective assistance of counsel, to his presence at a critical stage of the proceedings, and his right to due process.

---

5    Section 1138 provides in part: "After the jury have retired for deliberation, if there be any disagreement between them as to the testimony, or if they desire to be informed on any point of law arising in the case, they must require the officer to conduct them into court. Upon being brought into court, the information required must be given in the presence of, or after notice to, the prosecuting attorney, and the defendant or his counsel, or after they have been called."

13

Section 1138 "imposes a 'mandatory' duty to clear up any instructional confusion expressed by the jury." (*People v. Gonzalez* (1990) 51 Cal.3d 1179, 1212, superseded by statute on other grounds as stated in *In re Steele* (2004) 32 Cal.4th 682, 691.) "The court has a primary duty to help the jury understand the legal principles it is asked to apply. [Citation.] This does not mean the court must always elaborate on the standard instructions. Where the original instructions are themselves full and complete, the court has discretion under section 1138 to determine what additional explanations are sufficient to satisfy the jury's request for information. . . . But a court must do more than figuratively throw up its hands and tell the jury it cannot help. . . . It should decide as to each jury question whether further explanation is desirable, or whether it should merely reiterate the instructions already given." (*People v. Beardslee* (1991) 53 Cal.3d 68, 97.)

If the court errs in this respect, however, such error does not warrant reversal unless the defendant demonstrates prejudice. (*People v. Beardslee*, *supra*, 53 Cal.3d at p. 97.) Reversal is required only if it is reasonably probable that Rascon would have received a more favorable verdict if the court had properly responded to the jury's inquiry. (See *People v. Roberts* (1992) 2 Cal.4th 271, 326; *People v. Ainsworth* (1988) 45 Cal.3d 984, 1020.)

Under these standards, Rascon's claim of error fails. We reject the premise of Rascon's argument—that the record reflects the court did not perform its duty to contact counsel or respond to the jury's inquiry—in view of the short period that passed before the jury returned its verdicts and the state of the record on the matter. The minute order's silence on whether the clerk provided the court with the jury question or whether the

14

court contacted counsel does not demonstrate the court ignored the question or took no action. Indeed, on such a silent record, we apply the well-established presumption that "official duty has been regularly performed." (Evid. Code, § 664; see *People v. Stowell* (2003) 31 Cal.4th 1107, 1114-1115.) This silence, and the fact the juror's question appears in the appellate record, permits us to presume the court began to act upon it appropriately, but was interrupted by the jury's verdict. The fact the jury reached a verdict without receiving an answer, re-submitting the juror's question, or submitting another question, is an indication that the jury resolved its inquiry by other means and its desire for clarification ultimately became unnecessary. Thus, Rascon has not demonstrated the court mishandled the juror's question. (Compare, *People v. Beardslee*, *supra*, 53 Cal.3d at pp. 96-97 [trial court erred when in response to jury question about definition of premeditation and deliberation, trial court told jury in part " 'there is and can be no explanation of the instructions. You have to just work with them as they are printed [and] [d]o the best you can with them' "].) Rascon has shown no basis for reversal.

## II. *Claims of Instructional Error*

### A. *Instruction on False Imprisonment*

Rascon contends the court erred by failing to instruct the jury sua sponte on false imprisonment as a lesser included offense to kidnapping and kidnapping for rape. He maintains the evidence of his use of force was "exceptionally weak and equivocal," and countered by significant circumstantial evidence he "conveyed to [Curley] that he would help her or give her a place to rest for a moment," thereby using fraud or deceit to entice

15

Curley to voluntarily enter his motel room, secretly intending to assault her. Thus, he claims there was sufficient evidence of the lesser included offense of felony false imprisonment by the use of fraud or deceit, under section 237, subdivision (a), not the charged offense of kidnapping to commit rape, the special circumstance of kidnapping, or the kidnapping One Strike circumstance. He further maintains there was no evidence he used force or violence in moving Curley into his room, or evidence he deceived her given his inability to speak English, so that there was substantial evidence of the lesser included offense of misdemeanor false imprisonment, but not felony false imprisonment or kidnapping. Finally, Rascon argues that the nature of his movement of Curley "a mere three to five feet from [his motel] room" was such that the jury could have concluded the "asportation" was not substantial, but rather incidental to the rape.

We are not persuaded by these arguments. Instructions on lesser included offenses must be given when there is substantial evidence for a jury to conclude the defendant is guilty of the lesser offense but not the charged offense. (*People v. Breverman* (1998) 19 Cal.4th 142, 177.) Substantial evidence is defined for this purpose as "evidence sufficient to 'deserve consideration by the jury,' that is, evidence that a reasonable jury could find persuasive." (*People v. Barton* (1995) 12 Cal.4th 186, 201, fn. 8.) Thus, " 'the existence of "*any* evidence, no matter how weak" will not justify instructions on a lesser included offense, but such instructions are required whenever evidence that the defendant is guilty only of the lesser offense is "substantial enough to merit consideration" by the jury.' " (*People v. Hughes* (2002) 27 Cal.4th 287, 366-367.) "In deciding whether evidence is 'substantial' in this context, a court determines only its bare legal sufficiency,

16

not its weight." (*Breverman*, at p. 177.)  We apply a de novo standard of review to this question.  (*People v. Manriquez* (2005) 37 Cal.4th 547, 584; *People v. Turk* (2008) 164 Cal.App.4th 1361, 1367.)

On this record, there is no substantial evidence from which a reasonable jury could have found Curley's movement into Rascon's room to be consensual or induced by fraud or deceit; it is only speculation on which a jury could find Rascon guilty of the lesser offense of felony or misdemeanor false imprisonment, but not the greater offense of kidnapping to commit rape.  The evidence demonstrates Rascon was unable to speak or understand English; he and Curley did not speak at all to each other, and Curley was so highly intoxicated as to be unable to stand or act coherently, eliminating any indication Rascon used fraud, false pretenses, deceit, or otherwise communicated to Curley in such a manner to influence her compliance.  And, the surveillance video (which we discuss in more detail in part III(C), *post*) shows Rascon approaching and pulling Curley into his motel room, after having seen her drunk and falling down, permitting a conclusion that he knew she was impaired.  The sole evidence of any communication between them was nonverbal: Rascon's testimony that Curley purportedly signaled to him to come to her, and that Curley reached her hand out so he could help her up from the sidewalk.  Under Rascon's version of events, Curley motioned for him to come to her and eventually entered his motel room willingly, demonstrating neither unlawful detention nor unlawful asportation, and thus no kidnapping or false imprisonment.  In contrast, the evidence as we have summarized it all points "indisputably to a . . . kidnapping."  (See *People v. Kelly* (1990) 51 Cal.3d 931, 959 [evidence the defendant parked a van a short distance

ahead of children with engine running, assaulted a young girl from behind, put a gun to her head and dragged her toward the van, was evidence of an attempted kidnapping and did not warrant an instruction on felony false imprisonment].)

We reject Rascon's arguments to the extent he seeks to apply them to the jury's special circumstance findings. As he acknowledges, such special circumstance allegations are akin to sentencing enhancements and do not have any effect on what offenses are included in the charges to which they are associated. (*People v. Miller* (1994) 28 Cal.App.4th 522, 526; see also *People v. Wolcott* (1983) 34 Cal.3d 92, 100-101 [a special allegation that prescribes additional punishment is not to be considered in determining whether the accusation encompasses a lesser included offense].) In any event, because we conclude the evidence did not permit a reasonable jury to find Rascon committed the lesser offenses but not the greater kidnapping offense, there was no "spillover taint" to prejudice him as to these findings.

B. *Instruction on Voluntary Intoxication*

The trial court instructed the jury with CALCRIM No. 3426 on voluntary intoxication as follows: "You may consider evidence, if any, of the defendant's voluntary intoxication only in a limited way. You may consider that evidence only in deciding whether the defendant acted with the intent to kill or intent to rape. [¶] A person is voluntarily intoxicated if he or she becomes intoxicated by willingly using any intoxicating drug, drink, or other substance knowing that it could produce an intoxicating effect, or willingly assuming the risk of that effect. [¶] In connection with the charge of murder the People have the burden of proving beyond a reasonable doubt that the

18

defendant acted with the intent to kill or the intent to commit rape or the intent to kidnap. If the People have not met this burden, you must find the defendant not guilty of murder.

[¶] You may not consider evidence of voluntary intoxication for any other purpose."[6]

Rascon contends the court prejudicially erred by instructing the jury not to consider voluntary intoxication on the specific issues of premeditation and the kidnapping theory of first degree felony murder. Relying on *People v. Pearson* (2012) 53 Cal.4th 306 and *People v. Mendoza* (1998) 18 Cal.4th 1114, he argues that having undertaken to instruct on voluntary intoxication as to intent to kill and intent to rape, the court was obliged to not exclude it as to those issues. According to Rascon, under *People v. Banks* (2014) 59 Cal.4th 1113 (overruled on other grounds by *People v. Scott* (2015) 61 Cal.4th 363, 391, fn. 3) the error deprived him of his right to present a defense and made his trial fundamentally unfair in violation of the Sixth and Fourteenth Amendments, requiring that we apply the *Chapman* (*Chapman v. California* (1967) 386 U.S. 18, 24) federal constitutional standard of error.

The People respond that Rascon has forfeited the claim of error by failing to challenge the instruction, which was correct in law and responsive to the evidence, on

---

6      "It is well settled that '[a]n instruction on the significance of voluntary intoxication is a "pinpoint" instruction that the trial court is not required to give unless requested by the defendant.' " (*People v. Verdugo* (2010) 50 Cal.4th 263, 295; see also *People v. Bolden* (2002) 29 Cal.4th 515, 559.) "A defendant is entitled to such an instruction only when there is substantial evidence of the defendant's voluntary intoxication and the intoxication affected the defendant's 'actual formation of specific intent.' " (*People v. Williams* (1997) 16 Cal.4th 635, 677.)

19

grounds it was too general and incomplete.[7] The People further argue that any possible error is harmless in light of the balance of the instruction and the remaining jury instructions; they point out that the term "intent to kidnap" was included in the third paragraph of the instruction and the instruction referred to Rascon's "intent to kill" which the jury could reasonably view as applying to premeditation. According to the People, any possible flaw in the instruction as to premeditation is necessarily harmless because the jury found both special circumstances to murder to be true, and Rascon would still be guilty of first degree murder under the felony murder rule.

We are not persuaded by the People's forfeiture argument. Our Supreme Court has stated that "[a]lthough a trial court has no sua sponte duty to give a 'pinpoint' instruction on the relevance of evidence of voluntary intoxication, 'when it does choose to instruct, it must do so correctly.' " (*People v. Pearson*, *supra*, 53 Cal.4th at p. 325, citing *People v. Castillo* (1997) 16 Cal.4th 1009, 1015 (*Castillo*); see also *People v. Letner* (2010) 50 Cal.4th 99, 186.)

However, we reject Rascon's claim on the merits, as he has not demonstrated that the instructions *as a whole* were misleading. Our role is to determine the correctness of the jury instructions " 'from the entire charge of the court, not from a consideration of parts of an instruction or from a particular instruction.' " (*Castillo*, *supra*, 16 Cal.4th at

_____

7       The People also argue that Rascon has not presented a record adequate to review his claim of instructional error, but because they do not explain where the record is lacking, we do not address the argument.

20

p. 1016.) This is so for Rascon's claim that instructional error precluded the jury from properly considering evidence of his or her voluntary intoxication. (See *People v. Mendoza*, *supra*, 18 Cal.4th at p. 1134 ["[t]he appellate court should review the instructions as a whole to determine whether it is 'reasonably likely the jury misconstrued the instructions as precluding it from considering' the intoxication evidence"].) As to the kidnapping theory of first degree murder, the People point out that the court did in fact instruct the jury to consider Rascon's voluntary intoxication on the issue of his "intent to kidnap" in connection with the murder charge.

As to premeditation, *Castillo* held in the context of an ineffective assistance of counsel claim that a trial court "correctly and fully instructed the jury on the way in which the evidence of intoxication related to defendant's mental state, including premeditation" where the instructions made clear that voluntary intoxication was to be considered on the issue of the defendant's specific intent or mental state, though they did not specifically mention premeditation. (*Id*. at pp. 1014, fn. 2, 1015-1016.) *Castillo* pointed out that the trial court in that case had instructed the jury that a necessary element of murder is the "existence in the mind of the perpetrator of the specific intent to kill . . . ." (*Id*. at p. 1014, fn. 2.) Viewing the instructions as a whole, the court concluded they "correctly explained that, for the jury to find defendant guilty of first degree murder, it must find he acted with 'deliberation and premeditation.' They further explained that defendant's deliberation and premeditation to kill 'must have been formed upon preexisting reflection and not upon a sudden heat of passion or other condition precluding the idea of deliberation . . . .' A reasonable jury would have understood deliberation and

21

premeditation to be 'mental states' for which it should consider the evidence of intoxication as to either attempted murder or murder." (*Id*. at p. 1016.) The *Castillo* court explained further that "[p]remeditation is *not* an element of murder. Instead . . . premeditation distinguishes first degree murder from second degree murder." (*Id*. at p. 1017.) Thus, "[a]lthough the trial court might have adapted [the jury instruction] to refer to both the specific intent necessary for murder and the additional mental state necessary for first degree murder, its failure to do so did not mislead the jury in light of the rest of the instructions." (*Ibid*.) The *Castillo* court concluded that "[p]remeditation and deliberation are clearly mental states" and "refer to the quality of the intent to kill." (*Ibid*.) Thus, "[n]o reasonable juror would understand the instructions to permit the jury to consider intoxication in determining whether defendant specifically intended to kill but to prohibit it from considering that same intoxication in determining whether he premeditated and deliberated. . . . By relating intoxication to mental state, the instruction necessarily directed the jury's attention to evidence of intoxication as it related to premeditation and deliberation. It is not reasonably likely the jury misconstrued the instructions as precluding it from considering the evidence of [drug] use in deciding the degree of the murder." (*Ibid*.)

*Castillo*'s reasoning compels the same conclusion here. In this case, the jury was instructed that the crimes charged against Rascon "require proof of the union, or joint operation, of act and wrongful intent" and that to find a person guilty of the charged crimes, "that person must not only intentionally commit the prohibited act but must do so with specific intent and/or mental state" which "are explained in the instructions for that

22

crime or allegation." The court instructed the jury that Rascon was charged with murder, for which the People were required to prove Rascon committed an act that caused the death of another person, and when he acted had a state of mind called malice aforethought. It instructed the jury that it was to decide whether the murder was in the first or second degree, and that Rascon was prosecuted for first degree murder under three theories, including that the murder was willful, deliberate and premeditated. The court defined the terms willful, deliberate, and premeditated in terms sufficient to communicate to the jury that they all involved the defendant's state of mind.[8] We conclude in line with *Castillo* that under the instructions given here as a whole, a reasonable juror would understand he or she could consider evidence of voluntary intoxication in deciding not only whether Rascon intended to kill, but also whether his act was premeditated or deliberated.

Further, we agree with the People that any presumed error would be harmless in any event. This we decide under the *Watson* standard of prejudice (*People v. Watson* (1956) 46 Cal.2d 818, 836), as any error in instructing the jury on voluntary intoxication

---

[8]     The court instructed: "The defendant is guilty of first degree murder if the People have proved that he acted willfully, deliberately, and with premeditation. The defendant acted willfully if he intended to kill. The defendant acted deliberately if he carefully weighed the considerations for and against his choice and, knowing the consequences, decided to kill. The defendant acted with premeditation if he decided to kill before completing the acts that caused death. [¶] The length of time the person spends considering whether to kill does not alone determine whether the killing is deliberate and premeditated. The amount of time required for deliberation and premeditation may vary from person to person and according to the circumstances. A decision to kill made rashly or impulsively, or made without careful consideration is not premeditated. On the other hand, a cold, calculated decision to kill can be reached quickly. The test is the extent of the reflection, not the length of time."

"would have the effect of excluding defense evidence and is thus subject to the usual standard for state law error: 'the court must reverse only if it also finds a reasonable probability the error affected the verdict adversely to defendant.' " (*People v. Mendoza*, *supra*, 18 Cal.4th at pp. 1134-1135; see also *People v. Pearson*, *supra*, 53 Cal.4th at p. 325 [appellate courts "apply the 'reasonable probability' test of prejudice to the [trial] court's failure to give a legally correct pinpoint instruction" on voluntary intoxication].)

Here, there was compelling evidence, unrebutted by Rascon or any other witness, that despite indications Rascon had drank several beers in the hours before the crime and had a beer while Curley was in his room, his intoxication did not appreciably affect his mental state. Rascon testified, and the surveillance video showed, he approached Curley, attempted to take hold of her, and then picked her up after she fell. According to him, he then led her into his room, where he cleaned the blood off her face and engaged in a purportedly voluntary sexual encounter, even describing in detail the clothing he removed and that Curley removed. After the crime, Losano described Rascon arriving at his dealership in his car with a carton of beer, and asking for a ride. Losano did not describe Rascon as drunk, high or impaired. Thus, there is no indication Rascon lacked command of his senses during his interaction with Curley. A defendant's detailed account of the events in the night in question suggests an absence of evidence supporting voluntary intoxication affecting his or her mental state. (See *People v. Ramirez* (1990) 50 Cal.3d 1158, 1181 [holding there was no duty to instruct on intoxication where the defendant purported to give a detailed account of all of the events of the night in question and did not suggest that his drinking had affected his memory or conduct, but rather defended on

24

the ground he had not sexually assaulted or stabbed the victim at all and that the offenses must have been committed by another individual], overruled on another ground in *People v. Saille* (1991) 54 Cal.3d 1103, 1118-1119; *People v. Ivans* (1992) 2 Cal.App.4th 1654, 1662 [no sua sponte instruction on voluntary intoxication required where the defendant "gave detailed testimony about the events that morning" such that the evidence was insufficient to show his drug use had affected his mental state].)  On this record, any presumed error by the trial court in omitting a voluntary intoxication instruction on the issues of kidnapping or premeditation and deliberation is not prejudicial, as it is not reasonably probable the jury would have reached a different conclusion had those matters been specifically referenced in the court's instruction.

### III.  *Claims of Insufficiency of the Evidence*

A.  *Standard of Review*

In evaluating Rascon's claims concerning the sufficiency of the evidence, " 'we review the whole record to determine whether . . . [there is] substantial evidence to support the verdict—i.e., evidence that is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.]  In applying this test, we review the evidence in the light most favorable to the prosecution and presume in support of the judgment the existence of every fact the jury could reasonably have deduced from the evidence.' "  (*People v. Manibusan* (2013) 58 Cal.4th 40, 87.)  "Conflicts and even testimony which is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine credibility of a witness and the truth or falsity of the facts upon

25

which a determination depends. [Citation.] We resolve neither credibility issues nor evidentiary conflicts; we look for substantial evidence." (*People v. Maury* (2003) 30 Cal.4th 342, 403.)

We apply this same standard to the denial of a motion for judgment of acquittal made at the close of the People's evidence. (§ 1118.1 [defendant may move for a judgment of acquittal on any charged offense "if the evidence then before the court is insufficient to sustain a conviction of such offense . . . on appeal"]; *People v. Hajek* (2014) 58 Cal.4th 1144, 1182-1183; *People v. Houston* (2012) 54 Cal.4th 1186, 1215.) An appellate court reviewing the denial of a section 1118.1 motion, however, focuses only on the evidence—direct or circumstantial—as it stood at the point that the motion was made. (*Houston*, at p. 1215 [substantial evidence standard " 'applies to cases in which the prosecution relies primarily on circumstantial evidence and to special circumstance allegations. [Citation.] "[I]f the circumstances reasonably justify the jury's findings, the judgment may not be reversed simply because the circumstances might also reasonably be reconciled with a contrary finding" ' "].)

B. *Evidence of Curley's Intoxication for Purposes of the Rape Special Circumstance and Rape Felony Murder*

Rascon contends the record contains insufficient evidence that Curley's level of intoxication rendered her unable to exercise reasonable or even poor judgment. He

26

argues that Curley's age[9] and maturity, her life situation, her experience with drinking, and her conduct on the night in question (evidence Curley was belligerent, told Johnson to leave her alone, and that someone was laughing or talking in Rascon's room), shows she was not impaired mentally. He maintains that the fact Curley was able to refuse Johnson's entreaties to go to her room shows the ability to exercise reasonable judgment and give legal consent.

Alternatively, Rascon contends that even assuming his own testimony provided evidentiary support for this element, the court erred and denied his right to due process by denying his motion for acquittal, in which the trial court was required to consider only evidence from the People's case in chief.

We reject Rascon's contentions, which in effect ask us to reweigh the evidence. The question, as the People point out, for purposes of this offense is whether there is substantial evidence Curley was "prevented from resisting" due to an intoxicating, anesthetizing, or controlled substance. (§ 261, subd. (a)(3).) The question "is not whether the victim actually consented to sexual intercourse, but whether he or she was capable of exercising the degree of judgment a person must have in order to give legally cognizable consent." (*People v. Giardino* (2000) 82 Cal.App.4th 454, 462.) The statute requires "only that the level of intoxication be such that the victim is incapable of exercising the judgment required to decide whether to consent to intercourse." (*Id.* at

---

9       Rascon states Curley was 33 years old at the time of her death, but his record citations, including to an exhibit log identifying Curley's driver's license as an exhibit, do not reflect Curley's age or birth date.

p. 464.) "In deciding whether the level of the victim's intoxication deprived the victim of legal capacity, the jury shall consider all of the circumstances, including the victim's age and maturity. [Citation.] It is not enough that the victim was intoxicated to some degree, or that the intoxication reduced the victim's sexual inhibitions. 'Impaired mentality may exist and yet the individual may be able to exercise reasonable judgment with respect to the particular matter presented to his or her mind.' [Citations.] Instead, the level of intoxication and the resulting mental impairment must have been so great that the victim could no longer exercise reasonable judgment concerning that issue." (*Id*. at pp. 466-467; see also *People v. Smith* (2010) 191 Cal.App.4th 199, 204.) The jury was instructed consistently with these principles.

Here, the evidence showed Curley's blood alcohol level was between .29 and .40 percent at the time of her death, which is an extremely high level of intoxication, indeed, potentially fatal. According to the pathologist, most people would be asleep or hard to rouse at this level. This, combined with evidence that Curley was already intoxicated when she and Johnson left the motel (Johnson describing Curley as "pretty buzzed"); drank more at the bar; repeatedly referred to the bartender as her mother; was unable to walk or stand normally; was incoherent, combative and sobbing; and acted in what could reasonably be seen as an irrational manner by refusing to enter her motel room late at night, permitted the jury in this case to conclude that her mental impairment was so great that she no longer could exercise reasonable judgment concerning whether to consent to having intercourse with Rascon, a man who she did not know.

28

Rascon's reliance on the prosecution expert pathologist's testimony that a chronic alcoholic can function and "form an intent to go somewhere" is not evidence that Curley was herself a chronic alcoholic, or that she was experiencing the same condition on the night in question. And Johnson's testimony did not permit the jury to infer that Curley was capable of exercising reasoned judgment; he testified he was unfamiliar with Curley's condition when she was intoxicated, had never seen her before in such a state, and considered it very unusual. To the contrary, Johnson's testimony suggested Curley was incoherent and acting irrationally. Thus, Rascon's claim that Curley was an "experienced drinker who was able to function mentally even though she was physically impaired" or had "considerable experience with large quantities of alcohol" is speculation without support by any evidence. At best, such conclusions are inferences that the jury declined to draw in favor of other reasonable inferences drawn from the evidence concerning Curley's alcohol level and the other circumstances described above. These are the very sort of evidentiary disputes that are outside our province on a review for substantial evidence.

C. *Evidence of Use of Force or Fear for Purposes of Rascon's Motion to Acquit*

Rascon contends the trial court erred by denying his section 1118.1 motion for acquittal on the kidnapping charge and kidnapping special circumstance because the record lacks evidence he used force or fear to get Curley into his motel room; he maintains the sole evidence is from the motel surveillance video, which merely shows Curley falling back while he was leading her up the stairs after she had fallen to the sidewalk. Rascon argues that nothing in his statements to police supports the use of

29

force, since he admitted only that he "grabbed [Curley's] hand" and the video shows she extended her hand to be helped up. According to Rascon, though it is possible to conclude Curley was rebuffing Rascon, the more "obvious" explanation is that she was inebriated and kept stumbling and falling, and a mere possibility cannot constitute substantial evidence under *People v. Pearson*, *supra*, 53 Cal.4th 306 and *People v. Moore* (2011) 51 Cal.4th 386 (*Moore*). He maintains that as in *People v. Shelburne* (1980) 104 Cal.App.3d 737, the People's evidence refutes any "weak inference" that Curley was resisting rather than drunkenly falling back.

Again, these arguments improperly ask us to invade the jury's function and reweigh the evidence or determine the facts and inferences ourselves, which is outside our role as the reviewing court. (*People v. Hajek*, *supra*, 58 Cal.4th at pp. 1182-1183 [in determining whether the evidence was sufficient to support the denial of a section 1118.1 motion, " ' "[w]e do not determine the facts ourselves. . . . We do not reweigh evidence or evaluate a witness's credibility" ' "].) Substantial evidence may be based on inferences, and as long as the jury's inferences from the evidence are logical, reasonable, and rest on the evidence, they suffice. (See *In re Estate of Young* (2008) 160 Cal.App.4th 62, 76 [" ' inferences must be a "product of logic and reason" and "must rest on the evidence" ' "].) If the circumstances reasonably justify the jury's findings, the fact the circumstances might also reasonably be reconciled with a contrary finding does not provide a basis for reversal. (*Hajek*, at p. 1183; see also *People v. Sullivan* (2007) 151 Cal.App.4th 524, 564.)

Here, the video at issue, which we have viewed, is reasonably susceptible to different interpretations or conclusions, one of which is that before Curley falls to the ground, she pulls away from Rascon, a total stranger who tried to pull her toward his motel room when he initially approached her, and after she has fallen to the sidewalk and Rascon helps her up, she attempts to resist and pull away from Rascon before he pulls her by the arm or hand into his room. This interpretation—particularly in view of all of the evidence—is as equally plausible as a conclusion that Curley was merely stumbling from intoxication, but willingly entering Rascon's room. Thus, the circumstances are unlike *People v. Shelburne*, *supra*, 104 Cal.App.3d 737, where the appellate court described the evidence on intent to rob at a particular time "weak" or "tenuous at best." (*Id*. at p. 742.) We agree with the trial court that the video presented a question of fact for the jury, which the jury resolved in the People's favor by finding Rascon committed the count 3 kidnapping. Based on this evidence, viewed in the light most favorable to the prosecution, it is not sheer speculation to conclude Rascon forced Curley into his room by grabbing and pulling her, against her will. The fact a reviewing court may draw other conclusions from the evidence does not warrant reversal of the judgment. (*People v. Hajek*, *supra*, 58 Cal.4th at p. 1183; *People v. Manibusan* (2013) 58 Cal.4th 40, 87 [applying principle to specific intent element of a crime]; *People v. Leonard* (2014) 228 Cal.App.4th 465, 485.)

We reject Rascon's suggestion that *Pearson* and *Moore* stand for the broad proposition posited. Those cases turn on their specific facts, and are distinguishable. This case is unlike *People v. Pearson*, *supra*, 53 Cal.4th 306, in which the Supreme Court

31

found the evidence insufficient to support a finding the defendant had personally used a deadly or dangerous weapon—a stake or stick—in the commission of a rape, kidnap and murder. The defendant admitted to police that he and others wrestled the victim to the ground, moved her to the place where the assault occurred, raped her, kicked her and moved her body after the attack, but he asserted that two other men had used the stake or stick to beat and sexually penetrate the victim. (*Id*. at p. 318.) There was no physical evidence or eyewitness testimony that tied the defendant to the weapon, which was never recovered. (*Id*. at pp. 318-319.) The court observed: "No witness testified defendant used the stake, no out-of-court statements to that effect were introduced, and no physical evidence indicated he had used it. The evidence leaves it entirely *possible* defendant used the stake in attacking [the victim], but does not support a finding of such use beyond a reasonable doubt." (*Id*. at p. 319.) There, even viewing the evidence in the light most favorable to the judgment, the court held it insufficient to support a finding the defendant had personally used the stick in the attack. (*Ibid*.)

People v. Moore* involved the evidentiary basis for a hypothetical question posed to an expert witness; the appellate court held there that the record contained no evidence to support a hypothetical question's assumption that a bloodstain was deposited on carpeting from the victim's body as opposed to some other object: "The record contains no evidence the living room bloodstain was deposited directly from [the victim's] wounds, rather than from, for example, a weapon used to attack her." (*People v. Moore*, *supra*, 51 Cal.4th at p. 405.) Thus, the court held it was error to permit the expert to answer the prosecutor's hypothetical question, but the admission of that evidence was not

32

prejudicial because in light of the other evidence concerning the nature of the defendant's attack on the victim, it was not reasonably probable the jury would have reached a different verdict in the guilt phase absent the expert's answer. (*Id*. at pp. 405, 406-407.) Here, the jury had the video evidence from which to draw inferences, and we have held its conclusion that Curley resisted Rascon's attempt to force her into his motel room is reasonably drawn from that evidence.

D. *Evidence of Forcible Rape*

Rascon contends there was insufficient direct or circumstantial evidence he used force or fear to rape Curley, in addition to or instead of rape by intoxication. He points out there was no evidence Curley screamed or physically resisted; the expert pathologists did not testify to any defensive wounds; there was no medical evidence of forced penetration; and the injuries to Curley's head were consistent with a blow, rendering it speculation to conclude they were caused by something other than Curley's fall on the pavement outside the motel. As for evidence of strangulation and the plastic gag, Rascon argues there was no evidence of the reason for such acts, and it was equally possible the purpose of the strangulation and gagging was to prevent Curley from reporting she had been raped while intoxicated. Rascon therefore relies on the same proposition that a mere possibility cannot constitute substantial evidence.

Again, the evidence in this case permits multiple inferences or equally plausible conclusions, but on a sufficiency of the evidence review, we view the evidence in the light most favorable to the prosecution and presume in support of the judgment the existence of every fact the jury could reasonably have deduced from the evidence.

33

(*People v. Manibusan*, *supra*, 58 Cal.4th at p. 87.) We accept all logical inferences that the jury might have drawn from the direct and circumstantial evidence. (*Ibid*.) Doing so, we conclude that substantial circumstantial evidence permitted the jury to find that Curley was forcibly raped while being held or pushed down by Rascon. Our conclusion is based particularly on the expert pathologist's findings as to Curley's condition (her fractured hyoid bone and thyroid cartilage, as well as deep hemorrhages to her upper chest), evidence of Rascon's DNA in semen from the vaginal swab taken from Curley as well as under her nails, the partially unclothed condition and positioning of Curley's body on the floor of the motel room, the manner in which Rascon forced Curley into his room, Rascon's quick exit (leaving unopened bottles of beer in the room) and concealment of both his vehicle and Curley's driver's license, and the fact it is reasonable to conclude that Curley, whose alcohol level was extremely high, could not consent to intercourse.

IV. *Claim of Ineffective Assistance of Counsel*

In the People's trial brief, the People related that Curley had sent text messages earlier to a friend on the evening of her death in which Curley said she needed a friend, that she "tried to end [her] life," was troubled about her relationship with "Jay," and her family members would not speak to her. In a discussion of a pretrial motion on the matter, defense counsel elected not to seek admission of the messages; he acknowledged Curley had been text messaging a friend earlier on the day of her death, and pointed out there was no indication Curley's phone was used in the hours after Rascon had left the

34

motel room.[10]  Referring to the earlier messages, defense counsel stated, "These are hours and hours before, probably sent in some state of intoxication.  And my general feeling, that even if you could ascribe to her some suicidal or depressed thoughts, there's no reasonable possibility a juror is going to think that this is suicide or she herself summoned someone to kill her as an assisted suicide.  Both those positions, I think, are not rational on the facts of the case."

Rascon contends his counsel was prejudicially ineffective as to the rape special circumstance and the theory of rape felony murder by failing to introduce the text messages, which he maintains show Curley was suicidal or extremely depressed, and would have raised a reasonable doubt as to whether she was too intoxicated to exercise reasonable judgment, thereby invalidating her consent.  Though Rascon acknowledges his counsel elected as a tactical matter not to introduce the evidence because his counsel believed the jury would not think Curley committed suicide, he argues the tactical decision fell below constitutional standards for adequacy because the evidence was "highly relevant" to a different issue: to show Curley recklessly or impulsively went into Rascon's room because she did not care about the risk, an exercise of reasonable judgment notwithstanding her intoxication.  As for prejudice, Rascon maintains that the issue was close as to Curley's vitiated consent due to her intoxication, and thus he argues "the powerful evidence that Curley's rash judgment was attributable to something other

_____

10     Detective Griego did not testify about the time on the surveillance recording that showed Rascon leaving his motel room.  The People's trial brief states that the video shows Rascon left his room at 12:50 p.m.  Rascon's counsel also referred to that time in his closing argument.

than intoxication likely would have affected at least one juror's view as to whether there was a reasonable doubt that Curley's decision could be blamed on her intoxication."

" 'To establish ineffective assistance of counsel, a defendant must show that (1) counsel's representation fell below an objective standard of reasonableness under prevailing professional norms, and (2) counsel's deficient performance was prejudicial, i.e., there is a reasonable probability that, but for counsel's failings, the result would have been more favorable to the defendant.' " (*People v. Johnson* (2015) 60 Cal.4th 966, 979-980.) "In considering such a claim, 'a reviewing court defers to counsel's reasonable tactical decisions, and there is a presumption counsel acted within the wide range of reasonable professional assistance.' [Citation.] ' " 'Tactical errors are generally not deemed reversible, and counsel's decisionmaking must be evaluated in the context of the available facts.' " ' [Citation.] Because the presumption of counsel's competence can typically be rebutted only with evidence outside the record, ineffective assistance claims are normally raised in habeas corpus proceedings where such evidence can be presented. [Citation.] A reversal on direct appeal is warranted only if '(1) the record affirmatively discloses counsel had no rational tactical purpose for the challenged act or omission, (2) counsel was asked for a reason and failed to provide one, or (3) there simply could be no satisfactory explanation.' " (*People v. Arce* (2014) 226 Cal.App.4th 924, 930-931, quoting *People v. Mai* (2013) 57 Cal.4th 986, 1009.)

Here, counsel's decision not to introduce evidence of the text messages was a reasoned, "obviously tactical," decision. (See *People v. Lucas* (1995) 12 Cal.4th 415, 480.) Rascon is unable to show that "[his counsel's act or] omission was not attributable

36

to a tactical decision which a reasonably competent, experienced criminal defense attorney would make." (*People v. Gutierrez* (2002) 28 Cal.4th 1083, 1157.) Rascon's counsel's decision is well within the "wide range of acceptable tactical decisions a defense attorney must make" (*People v. Gray* (2005) 37 Cal.4th 168, 211), particularly in view of the fact that the absence of text messages from Curley after Rascon left the motel room was inconsistent with the defense theory that she was still alive up until the early morning hours of May 15, 2010. No constitutionally deficient assistance appears.

Further, we disagree with Rascon's characterization of the issue of Curley's consent and intoxication as "exceptionally close," and the notion that there was "powerful" evidence that Curley decided to enter Rascon's room and have intercourse with him out of depression. Given Curley's level of intoxication, the fact she was a mother in a two-year relationship with Henry, we conclude it was an extremely slim and weak inference to conclude that sadness or depression compelled Curley to willingly accompany a stranger into his motel room. And the jury heard about Curley's disagreement with Henry as well as evidence she was crying and sad that evening, thus we cannot say it is reasonably probable it would have reached a different conclusion had it learned of Curley's earlier text messages. Accordingly, the record does not establish prejudice.

## V. *Second Amended Information*

Relying on *People v. Mancebo* (2002) 27 Cal.4th 735 (*Mancebo*) and other analogous cases, Rascon argues that the One Strike circumstance for aggravated kidnapping (§ 667.61, subd. (d)(2)) must be stricken because it was not pleaded in the

37

second amended information as to the count 2 rape charge, but instead was erroneously pleaded as to the count 3 kidnapping charge. He maintains it would violate section 667.61, subdivision (o) to apply the jury's finding to count 2 even though the jury was instructed as to the elements of that enhancement as to count 2 and found it true beyond a reasonable doubt, because the kidnapping allegation on count 2 was not "alleged in the accusatory pleading pursuant to this section." (§ 667.61, subd. (o).)

In this case, the One Strike kidnapping allegation[11] was alleged as to the count 2 rape charge in three of the four earlier charging documents. The court instructed the jury on that allegation with respect to count 2 without objection from Rascon's counsel. The jury was provided with a verdict form for count 2 that included the One Strike allegation, again without defense counsel's objection. The jury found the allegation to be true as to count 2. During Rascon's sentencing hearing, the prosecutor acknowledged the allegations should have been applied to count 2 of the second amended information, and the trial court sentenced Rascon accordingly without objection. Based on these circumstances, the People respond that the flaw in the second amended information was harmless as the record affirmatively shows Rascon was on notice he was being charged with committing a rape during the commission of a kidnapping under section 667.61. They cite case law for the proposition that a reference to the wrong statute in an

---

11    Under section 667.61, subdivision (a), a defendant "who is convicted of an offense specified in subdivision (c) under *one* or more of the circumstances specified in subdivision (d) . . . shall be punished by imprisonment in the state prison for 25 years to life." (Italics added.) Hence, the true finding of a single circumstance in subdivision (d) of section 667.61 suffices for a 25-year-to-life prison sentence under subdivision (a).

38

accusatory pleading is of no consequence where specific allegations and evidence at the preliminary hearing give the defendant notice of the charge. They further argue Rascon forfeited his claim given the absence of objections.

We conclude the circumstances here do not rise to the level of a due process violation, because the record indicates Rascon and his counsel were aware during both trial and sentencing proceedings that the One Strike kidnapping allegation applied to the count 2 rape charge, and thus there was no surprise, inability to prepare a defense, or evidence that Rascon or his counsel were misled. (*Mancebo*, *supra*, 27 Cal.4th at p. 750; *People v. West* (1970) 3 Cal.3d 595, 612 [" 'Due process of law requires that an accused be advised of the charges against him in order that he may have a reasonable opportunity to prepare and present his defense and not be taken by surprise by evidence offered at his trial' "].) And there was no statutory violation as the existence of the circumstance was both "alleged in the accusatory pleading" and "found to be true by the trier of fact." (§ 667.61, subd. (o).) Subdivision (o) of section 667.61 requires no more.

These circumstances are unlike *Mancebo*, in which the California Supreme Court held unauthorized a sentence including 10-year gun-use enhancements based on a multiple-victim circumstance (§ 667.61, subd. (e)(5)) that was not pleaded in the information. (*Mancebo*, 27 Cal.4th at p. 745.) The Supreme Court observed that because the information "neither alleged multiple victim circumstances nor referenced subdivision (e)(5) of section 667.61 in connection with those counts[,] . . . no factual allegation in the information or pleading in the statutory language informed defendant that if he was convicted of the underlying charged offenses, the court would consider his multiple

39

convictions as a basis for One Strike sentencing under section 667.61, subdivision (a)." (*Mancebo*, at p. 745.) The trial court's substitution of the unpled multiple victims circumstance as a basis for imposing the One Strike sentences violated the express language of section 667.61, subdivision (f) and defendant's due process right to fair notice of the statutory bases of sentence enhancements brought against him, and the People's failure to include the multiple victim allegation was "deemed a discretionary charging decision." (*Mancebo*, at pp. 743-754.) "[I]n addition to the statutory requirements that enhancement provisions be pleaded and proven, a defendant has a cognizable due process right to fair notice of the specific sentence enhancement allegations that will be invoked to increase punishment for his crimes." (*Id*. at p. 747.) Under these particular circumstances, it would elevate form over substance to say Rascon lacked fair notice that the People intended to apply the particular One Strike kidnapping allegation to count 2. To the contrary, the record shows he was well aware that if he was convicted of the rape offense, the court would consider the kidnapping as a basis for harsher One Strike sentencing under section 667.61.

Rascon also asks us to consider *People v. Perez* (2015) 240 Cal.App.4th 1218 (*Perez*), decided after completion of the briefing in this case. In *Perez*, the Court of Appeal held that the People "must allege the specific One Strike law circumstances it wishes to invoke as to each count it seeks to subject to the One Strike law's heightened penalties." (*Id*. at p. 1227.) There, the People did not allege a One Strike circumstance with regard to a forcible oral copulation count, but did so as to other kidnapping and sexual penetration counts. (*Id*. at p. 1225.) They sought to argue in part that the court

had told the jury that certain enumerated circumstances would apply to the forcible oral copulation charge, but the Court of Appeal determined that the court referred only to two of the three. The appellate court nevertheless emphasized that "under *Mancebo*, what matters is notice by pleading, not actual notice." (*Perez*, at p. 1225.) It also pointed out that the record did not contain any amendment of the information, and the People's decision not to amend was deemed to be a discretionary charging decision under *Mancebo*, *supra*, 27 Cal.4th 735. (*Perez*, 240 Cal.App.4th at p. 1225.) The court struck the sentence imposed under the One Strike law as to the oral copulation count. (*Id.* at p. 1227.)

Perez declined to follow *People v. Riva* (2003) 112 Cal.App.4th 981, which found imposition of a section 12022.53 enhancement proper when it was alleged as to two counts, but not a third count. *Perez* reasoned that *Riva* was inapplicable to the One Strike law because section 12022.53 and section 667.61 are "different," even though the statutes involved have "nearly identical" language requiring pleading and proof. (*Perez*, *supra*, 240 Cal.App.4th at p. 1227.) In *Riva*, as in the present case, the verdict forms asked the jury to determine the truth of the enhancement as to all three counts, the defendant did not object, the jury found the allegation true as to all three counts, and the court imposed the enhancement on the third count. (*Riva*, at pp. 1000-1001.) The *Riva* court held there was no violation of section 12022.53, subdivision (j), which provides that, "For the penalties in this section to apply, the existence of any fact required . . . shall be alleged in the accusatory pleading and either admitted by the defendant in open court or found to be true by the trier of fact." (*Riva*, at p. 1002.) *Riva* stated that 12022.53, subdivision (j)

41

"only requires the facts necessary to sustain the enhancement be alleged in the information; it does not say where in the information those facts must be alleged or that they must be alleged in connection with a particular count in order to apply to that count." (*Id*. at p. 1001.) It further stated, "Had the Legislature intended an enhancement under section 12022.53 be specifically pled as to each count the prosecution sought to enhance, it knew how to say so clearly." (*Ibid*.) In *Riva*, "the prosecution complied with the literal language of the statute by alleging the enhancement in the information as to the charges of attempted voluntary manslaughter and assault." (*Ibid*.) Distinguishing *Mancebo*, *supra*, 27 Cal.4th 735, the *Riva* court thus held the prosecution put the defendant on notice he was being charged with the enhancement; the failure to plead it as to one count did not abrogate the defendant's ability to challenge its factual basis, and he was on notice as to the other counts that he had to defend against the allegation. (*Riva*, at pp. 1002-1003.)

We decline to follow *Perez* and its rationale, which rests in part on considerations involved when a defendant pleads guilty.[12] Rather, under the specific circumstances here, as in *Riva*, Rascon did not suffer a due process violation and no sentencing error occurred. Additionally, we conclude Rascon forfeited his challenge to the pleadings. (Accord, *People v. Houston*, *supra*, 54 Cal.4th at pp. 1226-1228 [though indictment did

---

[12] In part, the *Perez* court reasoned: "Unlike sentencing enhancements, a defendant can only plead guilty to a One Strike law crime if the circumstances necessary to trigger that crime are pled—that is how the defendant knows the maximum sentence he or she faces and what he or she must admit during the plea." (*Perez*, *supra*, 240 Cal.App.4th at p. 1227.)

not allege that attempted murders were deliberate and premeditated and did not comply with section 664, forfeiture occurred where the trial court expressly noted that defendant, if convicted, would be sentenced to life imprisonment; the court asked the parties to say if there was a problem with the proposed jury instructions and verdict forms; the court later said the attempted murder verdict form would include deliberate and premeditated attempted murder as a special finding; at the close of evidence, the trial court instructed the jury to determine whether the attempted murders were willful, deliberate, and premeditated and told the jury a special finding on this question appeared on the verdict form; and the jury made an express finding that the attempted murders were willful, deliberate and premeditated; court held "[b]ecause defendant had notice of the sentence he faced and did not raise an objection in the trial court, he has forfeited this claim on appeal"].)

## VI. *Claimed Sentencing Errors*

Rascon challenges several aspects of his sentence, two of which the People concede. We conclude only Rascon's challenge to his award of conduct credits has merit.

### A. *Award of Conduct Credits*

Custody credit is calculated from the date of arrest through the date of sentencing. (*People v. Rajanayagam* (2012) 211 Cal.App.4th 42, 48.) Pointing out he was arrested on May 15, 2010, and was sentenced on June 5, 2014, Rascon contends he should have been awarded 1483 days of actual credit as the probation department calculated, not 1428 days as the trial court awarded. He also points out that the minutes and abstract of judgment do not reflect any credits. The People concede these points, and we agree that

43

Rascon should have been given 1483 days of actual credit. The abstract of judgment must be corrected to award Rascon 1483 days of actual conduct credits.

B. *Section 1202.4 Restitution Fine*

At Rascon's sentencing hearing, Rascon's counsel asked the court to impose the statutory minimum amount of the state restitution fine under section 1202.4. The People asked the court to impose the full $10,000 fine. The reporter's transcript shows the court imposed a $10,000 restitution fine under section 1202.4.

Rascon asks us to remand the case to have the trial court clarify whether the restitution fine was actually $1,000. He bases his request on the fact the court apparently handwrote "1,000" under the probation officer's recommended fine of $10,000 and the fact the abstract of judgment reflects a fine of $1,000. However, as the People correctly point out, the abstract of judgment is not itself the judgment of conviction, and cannot prevail over the court's oral pronouncement of judgment to the extent the two conflict. (See *People v. Mitchell* (2001) 26 Cal.4th 181, 185.) We see no reason to conclude the trial court misspoke in ordering the maximum fine, particularly after its remarks concerning the heinous and vicious nature of Rascon's crimes. We order the abstract of judgment corrected to reflect the $10,000 restitution fine imposed by the court under section 1202.4. (*Mitchell*, at p. 185.)

C. *Parole Revocation Restitution Fine*

Rascon contends the abstract of judgment must be corrected to delete the reference to a stayed $7,500 parole revocation fine, which he correctly points out the trial court did

not impose. The People concede that the fine should be stricken from the abstract. We conclude the parties are mistaken.

Section 1202.45, subdivision (a) provides: "In every case where a person is convicted of a crime *and his or her sentence includes a period of parole*, the court shall at the time of imposing the restitution fine pursuant to subdivision (b) of Section 1202.4, assess an additional parole revocation restitution fine in the same amount as that imposed pursuant to subdivision (b) of Section 1202.4." (Italics added.) Thus, where the only sentence imposed is life without the possibility of parole, there is no parole eligibility and the fine is not applicable. (*People v. Jenkins* (2006) 140 Cal.App.4th 805, 819; *People v. Oganesyan* (1999) 70 Cal.App.4th 1178, 1181.) However, when a defendant is sentenced to death as well as other determinate prison terms under section 1170, subdivision (h), the defendant's sentence "includes a period of parole" and thus the fine is required to be imposed and suspended unless and until the defendant is released on parole and his parole is revoked. (See *People v. Brasure* (2008) 42 Cal.4th 1037, 1075.) And, when a defendant is sentenced to state prison, his sentence usually includes a period of parole supervision. (*People v. Preston* (2015) 239 Cal.App.4th 415, 424-425, citing section 3000, subd. (a)(1) [" 'A sentence resulting in imprisonment in the state prison . . . shall include a period of parole supervision or postrelease community supervision, unless waived . . . .' "]; see also *People v. Nuckles* (2013) 56 Cal.4th 601, 609.)

Here, in addition to Rascon's sentence on count 1 to life without the possibility of parole, Rascon was sentenced to an indeterminate term of 25 years to life on count 2, and a life term on count 3, which included a 10-year period of parole. (See § 3000, subd.

(b)(3).) As a result, Rascon's sentence met the requirements of section 1202.45, as it included a period of parole.

Rascon suggests that the fact the court stayed his sentences on counts 2 and 3 under section 654 means that under *People v. Brasure*, those stayed sentences are not taken into account for purposes of the parole revocation restitution fine. We acknowledge that the court in *Brasure*, reasoning a parole revocation fine was authorized in that case, referred to determinate terms imposed but not stayed under section 654. (*People v. Brasure*, *supra*, 42 Cal.4th at pp. 1049, 1075.) But *Brasure* did not expressly address section 654, and we are not persuaded the court distinguished between terms stayed and those unstayed. More importantly, the statute does not make any such distinction. The *Brasure* court pointed out that it was unlikely the defendant in that case would ever serve any part of the parole period and that the fine was only payable if he actually began to serve a parole period and parole was revoked. (*Id*. at p. 1075.) It reasoned: "Nonetheless, such a [parole] period was included in his determinate sentence by law and carried with it, also by law, a suspended parole revocation restitution fine." (*Ibid*.) This reasoning applies equally to sentences stayed under section 654.

Like the defendant in *Brasure*, Rascon's sentence includes a term that carries with it a period of parole (§ 3000, subd. (b)(3)), and a suspended parole revocation fine. (§ 1202.45; *People v. Brasure*, *supra*, 42 Cal.4th at p. 1075.) And, as in *Brasure*, Rascon "is in no way prejudiced by assessment of the [suspended parole revocation] fine, which will become payable only if he actually does begin serving a period of parole and his

46

parole is revoked." (*Brasure*, at p. 1075.)[13]  Under the statute, the fine is to be "in the same amount as that imposed pursuant to subdivision (b) of Section 1202.4."  (§ 1202.45, subd. (a).)  Having concluded that the abstract should reflect a $10,000 fine under section 1202.4, we order the abstract further corrected to reflect a suspended parole revocation restitution fine in the amount of $10,000.

---

[13]    Though Rascon does not cite to the case, we acknowledge that in *People v. McWhorter* (2009) 47 Cal.4th 318, the California Supreme Court accepted the People's concession and struck a parole revocation fine where the defendant was sentenced to death as well as some other unspecified term on a first degree residential robbery.  (*Id.* at p. 380.)  The court's decision was without analysis other than to cite *People v. Oganesyan*, *supra*, 70 Cal.App.4th 1178.  (*McWhorter*, at p. 380.)  The court's conclusion is in apparent conflict with the reasoning in *People v. Brasure*, *supra*, 42 Cal.4th 1037.  We elect to follow *Brasure*'s reasoned and developed analysis.

DISPOSITION

The judgment is modified to award Cesar Omar Gonzales Rascon 1483 days of actual conduct credit, reflect a $10,000 restitution fine under Penal Code section 1202.4, and reflect a suspended $10,000 parole revocation restitution fine. As so modified, the judgment is affirmed. The clerk of the superior court is directed to prepare an amended abstract of judgment in these respects, and forward a certified copy of it to the Department of Corrections and Rehabilitation.

O'ROURKE, J.

WE CONCUR:

McCONNELL, P. J.

BENKE, J.